TATE, Judge.
By this suit the plaintiffs seek to recover damages resulting from the defendant’s construction of a pipeline. The damages were caused on a 41-acre tract belonging to the Evangeline Parish School Board and occupied by the plaintiffs pursuant to a rental agreement.
The defendant pipeline company (“Texas”) appeals from a trial court award, while the plaintiffs answer the appeal, requesting an increase.
The evidence shows that the school board executed a right of way agreement with Texas on August 30, 1960. The school board granted a pipeline right of way to Texas across an entire school board section of land, with the right to use an additional work area during the period of construction.
At the express request of the school board, as one of the conditions of the right of way agreement, a clause was included in the agreement by which Texas obligated itself “to pay for any damaged crops, fences, timber and other improvements” and also “to bargain and make all settlements with all tenants across whose land said pipe line traverses, for any and all damages to cultivated lands or woodlands, and damages to growing crops thereon, etc.” [1] *159 This suit is based upon the alleged obligation of Texas to pay damages by reason of this clause.
For many decades the school board had rented to various individuals specified tracts within the school board Section 16 in question. Such agreements were renewable each year upon the payment of annual rentals.
The plaintiff father had rented the present 41-acre tract since 1923, for instance. In fact, the plaintiff son had built his home on this tract in 1951 and had occupied it since. The plaintiffs, father and son, were joint “renters” of the tract in 1960 and 1961 (and thereafter).
The chief defense by Texas to this suit for damages is raised by its contention that these annual rental agreements (although confected by procedures valid prior to 1940) did not comply with statutory provisions enacted in 1940 and presently applicable, which require prior advertising and competitive leasing of public lands. LSA-R.S. 41:1211-41:1221.
We find this defense by Texas to be without merit. Although the plaintiffs may not have been “tenants” holding by reason of a valid lease, nevertheless the evidence shows that the school board had explicitly granted the right of way across the land to Texas, only upon the condition that Texas obligate itself to pay “any and all damages” caused by construction of the pipeline to “all tenants across whose land said pipeline traverses”- — with the express intention, which was agreed to by Texas’s agent who negotiated the pipeline right of way agreement, that the “tenants” referred to were the plaintiffs and the other “renters” (as termed in school board resolutions) who occupied the school board lands in Section 16 under annual rental agreements confected by simple resolution and without prior advertisement or bidding. This was, in fact, the only leasing procedure followed as to all lands within the section.
Thus the right of way agreement executed between the school board and Texas specifically intended, as an express consideration of the contract, to obligate Texas to pay the plaintiffs any and all damages caused them by reason of the construction of the pipeline across the school board lands rented by them. This stipulation pour autrui, or contract for the benefit of third persons, creates a valid obligation in favor of such third persons, which is enforceable by them. LSA-Civil Code Article 1890; First State Bank v. Burton, 225 La. 537, 73 So.2d 453. (Further, it strikes us that Texas, having accepted the benefits of the right of way agreement, cannot repudiate its obligation to pay the express consideration due from it in payment for such benefits received by it. Galiano v. Galiano, 213 La. 332, 34 So.2d 881.)
It is true that the present rental agreement between the plaintiffs and the school board may have been unenforceable between the parties for failing to comply with the statutory prerequisites of prior advertisement and competitive bids; for this and the other rental agreements relating to Section 16 were merely renewed each year by the school board by simple unadvertised resolution, in the procedure valid prior to 1940. See Ellis v. Acadia Parish School Board, 211 La. 29, 29 So.2d 461; noted at 8 La. Law Rev. 201-202, 1948. But the validity of these rental agreements is not an issue in the present proceedings, where the renters under them are enforcing their independent rights as the third party beneficiaries of a direct contractual obligation in their favor created by the stipulation pour autrui.

*160
Damages

The trial court awarded the plaintiffs a total of $3960 damages, including: $3000, for the loss of crawfish in a 20-acre craw-fish lake which was destroyed by the construction of the pipeline; $660, for the cost of repairing certain damages resulting from the construction, such as releveling large mounds, repairing damages to a gate and irrigation canals and passageway, etc.; and $300, for the complete loss of the 1961 rice crop on land damaged by the construction project.
Alternative to its main defense, the defendant-appellant contends that this award is excessive. As earlier stated, by their answer to the appeal the plaintiffs-appellees pray for an increase.
The evidence shows that the pipeline construction crew came across the land commencing October 14, 1960, and that due to extremely heavy rains the heavy construction machinery considerably mailed both the right of way itself and the extra working area. Because of the bad weather and the apparent haste of Texas to complete the project, no clean-up crews were sent by Texas to repair the damages. Consequently, the levees of the plaintiffs’ tract were left cut and large mounds of dirt were left thrown up over the premises, etc. Also, the levees of a 20-acre crawfish lake had been cut where the pipeline right of way ■crossed a corner of the lake within the plaintiffs’ tract, leaving the water and the young crawfish to drain out over the neighboring lands.
1. Repair damages. The $660 repair damages are not seriously questioned by the defendant, and they are proved by the record. Although the plaintiffs produced persuasive reasons suggesting such repair items should be increased, we do not find any manifest error by the trial court in this award.
2. Crop loss. The defendant Texas ■claims, however, that it is not liable under ’the agreement for the net $300 damage caused to the 1961 rice crop. (This resulted from the disturbance of the top soil on the two-acre strip right of way across the plaintiffs’ rice field, which consequently produced a grossly insufficient yield of rice.) Since this loss was occasioned to the plaintiffs during the 1961 renewal of the 1960 lease, Texas claims it is not liable because it contracted to pay crop damages on August 27, 1960, during the 1960 term of the plaintiffs’ rental agreement.
However, Texas had specifically agreed to pay “any and all damages” caused to the plaintiffs by the construction of the pipeline over their tract. We find no error in the trial court’s award of $300 crop loss damage resulting from the pipeline construction, which is supported by the evidence.
3. Crawfish loss. The most serious complaint as to damages by Texas, is with regard to the $3000 awarded for the loss of crawfish to the, plaintiff occasioned by the destruction of their crawfish lake.
The evidence shows that the plaintiffs had entered the crawfish raising business on a commercial scale in the 1959-1960 season, about a year prior to construction of the pipeline. During this season, they received $2700 income from a 12-14-acre lake on another part of their property.
Their substantially uncontradicted testimony, corroborated by the wholesale purchaser of crawfish with whom they entered into purchase agreements in the years 1959— 1962, is that (since such crawfish lakes are rotated from year to year) they had long prior to construction of the pipeline selected the present field on which to construct their 1960-1961 crawfish lake; that they had flooded and commenced preparing this tract for the 1960-1961 season in early July and had drained into it rice flooding water from other rice fields during August. See, e. g.: Tr. 116, 493, 555-557, 587, 621-622. The evidence further shows that the crawfish lake waters and young crawfish could have been retained, had the construction crew built a check-levee along the cut in the dam *161 where the pipeline crossed a corner of the lake levee; a relatively simple and inexpensive operation for defendant’s construction crew with its heavy construction equipment available there at the site. Tr. 151, 169, 171.
There is little in the record to corroborate the defendant’s suspicion, announced in its brief, that the plaintiffs went to the expense and trouble of deliberately locating their 1960-1961 crawfish lake in the projected path of the pipeline right of way, just so as to cause them to lose their entire craw-fish income during that season in favor of the privilege of litigating the presently contested lawsuit with Texas.[2]
The plaintiffs’ lake had been tested and found to be productive by the crawfish wholesaler about three weeks before the construction of the pipeline. The overwhelming preponderance of the evidence shows that a 20-acre crawfish lake such as the one in question should have produced nearly 2000 pounds of crawfish per acre during the season, all of which could have been sold at a minimum price of ten cents per pound. The trial court therefore awarded the plaintiffs $3000 for the loss of their crawfish, based on the loss of an average of 1500 pounds per acre for the 20-acre lake.
The evidence shows without question that the defendant’s work crew did cut the craw-fish lake levees, which permitted the waters and young crawfish to drain from the lake out onto the neighboring lands, which caused the complete loss of the plaintiffs’ crawfish crop for the year.
Texas nevertheless urges that it cannot be held liable for such losses because they are speculative in nature and insusceptible of proof.
In cases where, although there is a legal right to recovery, an exact estimate of damages cannot be made, the courts nevertheless have discretion to assess same based upon all the facts and circumstances of the case. Brantley v. Tremont & Gulf Railway Company, 226 La. 176, 75 So.2d 236 (loss of minnows); Harrison v. Petroleum Surveys, La.App. 1 Cir., 80 So.2d 153, certiorari denied (loss of muskrats in trapping area). In the Brantley case, for instance, a railroad cut a levee and permitted a minnow pond’s water to escape, causing the landowner to lose a great number of minnows he maintained in the lake to sell as fishing bait. Rejecting defenses similar to those advanced herein by Texas, the Supreme Court affirmed the trial court’s award of damages, which was based upon the court’s estimate of the probable number of minnows lost, at their market price for the season.
The situation here is unlike that in Texas Gas Transmission Corp. v. Fuselier, La.App., 133 So.2d 828, 835, where we disallowed any loss of crawfish income. There, the landowner, who had never raised a crawfish crop before, had merely planned to do so in the coming year and had not yet commenced any preparations for the pro *162 duction of a crawfish crop at the time the right of way was expropriated. Unlike the present situation, the loss of crawfish income therein was too speculative and uncertain to constitute a recoverable damage under the circumstances of that case.
We therefore find no merit in the defendant’s contention. Although the plaintiffs produced considerable evidence that the average production of crawfish should have been greater than the 1500 pounds per acre awarded by the trial court, we find no abuse of the trial court’s discretion in the award, which is justified under all the facts and circumstances of this case.
For the foregoing reasons, the judgment of the trial court is affirmed.
Affirmed.

. The pertinent clause in full provides as follows: “The grantee [Texas], by the acceptance hereof, agrees to bury the pipe line so that it will not interfere with the cultivation of the land, and also to pay for any damaged crops, fences, timber and other improvements, which may arise from laying, constructing, maintain *159 ing, operating, altering, repairing, removing, changing the size of and replacing said pipe line. Grantee hereby obligates itself to bargain and make all settlement with all tenants across whose lands said pipe line traverses, for any and all damages to cultivated lands or woodlands, and damages to growing crops thereon, etc.”

. As a matter of fact, the record reflects that, subsequent to the first flooding of their crawfish lake, the plaintiffs had been approached by and had negotiated with representatives of Texas but had refused to sign an agreement consenting to the laying of a pipeline across their school board holdings, because the parties could not agree upon an adequate consideration. The plaintiffs therefore were extremely surprised when, without their consent, representatives of Texas tore down their fences and cut their levees, as Texas proceeded through the plaintiffs’ fields. The plaintiffs had at once sought to file criminal charges based upon what they felt to be a criminal trespass, and they had also originally sought large general damages for this trespass. Both of these efforts were apparently abandoned, since Texas may have had a legal right to enter upon the plaintiffs’ lands in derogation of their unrecorded rental agreements, by virtue of the right of way agreement with the school board executed by Texas, by which Texas agreed to pay the plaintiffs and those similarly situated any damages caused to them by the construction of the pipeline across lands held by them.