NAT HARRISON ASSOCIATES, INC., Plaintiff-Appellee,

v.

GULF STATES UTILITIES COMPANY, Defendant-Appellant.

No. 73–1013.

United States Court of Appeals, Fifth Circuit.

March 25, 1974.

Rehearing and Rehearing En Banc Denied May 1, 1974.

C. W. Phillips, Baton Rouge, La., for defendant-appellant.

James E. Glass, John Robert Terry, Miami, Fla., Carlos G. Spaht, Baton Rouge, La., for plaintiff-appellee.

Before WISDOM and AINSWORTH, Circuit Judges and RUBIN, District Judge.

AINSWORTH, Circuit Judge:

This appeal by Gulf States Utilities Company arises from a diversity suit by Nat Harrison Associates, Inc., against appellant, seeking damages of $1,200,000 resulting from claims for acceleration and breach of a construction contract and for retainage held under the contract.

The district court granted partial summary judgment, with respect to the retainage, which judgment has been satisfied and is not before us in this appeal. Trial before a jury on the acceleration and breach of contract claims resulted in a verdict of $225,000 for Harrison. Judgment was entered for that

amount with interest at 5 per cent per annum from the date of acceptance of the contract. Attorneys' fees, stipulated by the parties at 15 per cent, were awarded on both the retainage recovered and on the jury verdict. Gulf States appeals the judgment entered on the jury verdict, the award of interest, and both awards of attorneys' fees. We affirm in part and reverse in part and remand.

The pertinent facts are these. On December 18, 1964, Harrison and Gulf States entered into a written contract under which Harrison agreed to construct approximately 158 miles of 500 KV single-circuit, three-phase transmission line in Louisiana. Under the contract and specifications, Gulf States was obligated to obtain and furnish to Harrison both a cleared right of way in several 10-mile sections and all of the basic materials necessary above the ground for the construction of the transmission line. The contract specified time sequences within which various sections of the line were to be constructed, as well as the starting points and termination points of construction. The contract allowed extensions of time for delays attributable to the "elements, war, riot, strikes and other unavoidable casualties" and for an "equitable extension of time" in the event Gulf States failed to meet the delivery schedule for materials and right of way. "No additional compensation of any nature," however, was to be paid as a result of Gulf States' delays in furnishing right of way and materials. Provision was made for liquidated damages of $500 per day for failure to finish the work by the completion date. The contract also provided that Harrison give Gulf States immediate written notice of extra costs caused by any instruction of Gulf States and that written approval of Gulf States be obtained for such cost or charge prior to incurring it. Completion of the contract was scheduled for February 15, 1967. The foundation work under the contract was subcontracted to American Piling Company, Inc., and the wirestringing operation was subcontracted to Jackson-Morgan.

In January 1966, Gulf States invited Harrison to submit a bid to construct an "underbuild" on a portion of the transmission line. This portion of the line was known as line 342. An underbuild is an additional tower arm on which, in this instance, a 138 KV line was to be strung under the 500 KV line. Harrison submitted several price proposals based on different delivery dates for materials to be furnished by Gulf States. These bids ranged from $454,140 to $567,675. After further negotiation, a new price proposal was submitted and an agreement reached. On February 28, 1966, Gulf States issued to Harrison a revision order for construction of the underbuild at a price of $383,035. Construction was to begin about March 1, 1966, and be completed by October 1, 1966.

Line 342, containing the underbuild, was completed by October 15, 1966. Construction of the entire line was completed by approximately March 15, 1967, and Gulf States accepted the work under the contract as of July 19, 1967.

On December 16, 1969, Harrison brought this action in the United States District Court for the Middle District of Louisiana. Count I of the complaint was the claim for retainage, Count II sought damages resulting from acceleration of the contract, and Count III claimed damages for breach of Gulf States' duties under the contract to furnish the right of way and materials so that Harrison could perform its work timely and in sequence. After partial summary judgment was granted on the retainage claim, Gulf States was denied summary judgment on Harrison's remaining contentions, and a trial, split on the issues of liability and damages, was held before a jury.

At the trial Harrison offered evidence to show that the alleged breach and acceleration of the contract took place largely in 1966 and pertained principally to the construction of line 342. The testimony indicated that beginning in March 1966 Harrison was unable to perform its work on schedule and in sequence due to Gulf States' failure to

provide the necessary right of way and materials, and due to inclement weather, strikes, and other conditions. During 1966, Harrison, as a result of delays due to inclement weather, strikes, and other conditions, requested extensions of time totaling 46 work days. These requests were apparently ignored or refused by Gulf States. In April 1966, moreover, Gulf States, through its engineers, issued a letter setting up a schedule for completion of line 342 by October 15, 1966. The engineers indicated that the completion date was not to be changed for any reason, including time lost due to inclement weather. In addition, Harrison was directed to take immediate steps to provide additional manpower and equipment in order to maintain the October 15, 1966, completion date. Further testimony indicated that Gulf States' late deliveries of materials and failure to provide right of way on schedule persisted through the year, both in the construction of line 342 and on other portions of the transmission line.

When the case was first submitted to the jury on the liability question, a verdict was returned in favor of Harrison. The claim was then tried before the jury on the issue of damages, and the jury assessed damages against Gulf States in the amount of $225,000, for which judgment was entered.

On appeal, Gulf States raises several contentions. First, it seeks reversal of the judgment below on the ground that the provision in the contract requiring Harrison to give Gulf States immediate written notice of "extra costs" caused by any instruction of Gulf States and to first obtain written approval for such costs acts as a bar to Harrison's recovery of the costs of acceleration. Alternatively, Gulf States argues that a new trial should be granted because of the district court's failure to instruct the jury that prior notice was a prerequisite to recovery. Second, Gulf States contends that Harrison released its acceleration and breach of contract claims by executing a letter dated April 24, 1967, purporting to settle all outstanding claims for a stated cash consideration. Alternatively, Gulf States assigns error to the trial court's failure to instruct on estoppel with respect to this letter.

Gulf States' third contention is that the jury lacked a sufficient basis on which to assess damages. Again, Gulf States urges in the alternative that a new trial should be granted. Its alternative contention rests on the trial court's failure to give certain requested instructions pertaining to damages and on the court's admission in evidence of a certain exhibit relating to the damage issue. Finally, Gulf States challenges the trial court's awards of attorneys' fees on the retainage and of interest on the judgment from the date of Gulf States' acceptance of the contract.

## I.

### A. Notice Requirement

Gulf States' initial contention is that Harrison's suit is barred as a matter of law because of the latter's failure to comply with the notice provision of the contract. That provision provides in relevant part:

No alterations shall be made in the work, nor shall any charge be made by Contractor for extra work, without the prior written approval of such duly authorized representative [of Gulf States]. If Contractor claims that any instructions from the Company involve extra costs under the Contract, or will delay the completion date of the contract work, Contractor shall give Company immediate written notice of such and shall first obtain written approval by Company's duly authorized representative of such additional charge and new completion date prior to commencing such work.

The general rule in Louisiana favors the validity of contract provisions requiring notice for extra work:

[N]o claims for extra work or materials shall be allowed unless made in writing * * * and that when the contract so provides, and there is no written order for such extras, no re-

covery can be had for them in the absence of a waiver of that stipulation. (Citations omitted.)

Welch-Eckman Const. Co. v. Vancouver Plywood Co., La.App., 3 Cir., 213 So.2d 134, 135 (1968), quoting Meaux v. Southern Constr. Corp., La.App., 3 Cir., 159 So.2d 156, 161 (1963); see French Market Homestead Ass'n v. Usner, 170 La. 783, 129 So. 202, 208 (1930). During the course of the contract, Harrison submitted more than two hundred requests for extra payments. The first notice of the amounts here in issue, however, was by letter from Harrison dated July 21, 1967, after completion of the work and after acceptance by Gulf States. The dispute at the trial centered on whether the costs allegedly incurred by Harrison were "extra costs" within the meaning of this notice provision. The jury was instructed on the assertions of both sides with respect to this clause.

■ The obvious purpose of notice provisions such as the one at issue here is the protection of the owner against mistaken or fraudulent charges in the work under the contract. *See* 6 A. Corbin, Contracts § 1295 (1962). These clauses in construction contracts make the written order a condition precedent to an enforceable right to payment for extra work. *See* 3A *id.* § 756 (1960).

■■ There is a point, however, at which changes in the contract are to be considered beyond the scope of the contract and inconsistent with the "changes" section. J. D. Hedin Construction Company v. United States, 1965, 347 F.2d 235, 257, 171 Ct.Cl. 70. "[A] determination of the permissive degree of change can only be reached by considering the totality of the change and this requires recourse to its magnitude as well as its quality." Saddler v. United States, 1961, 287 F.2d 411, 413, 152 Ct.Cl. 557. Damages can be recovered without fulfillment of the written notice requirement where the changes are outside the scope of the contract and amount to a breach. *Id.* Since the evidence supports the jury's finding that there was a breach of contract, we are unable to hold, as a matter of law, that Harrison was required to give prior notice of the additional costs it claims here or that it is not entitled to damages for fundamental alteration of the contract.

■ Moreover, a written notice provision in a contract may be waived:

> Even where the contract had a provision to the effect that the owner shall not be liable for any extra work unless the owner has given written authorization for that work, the consistent actions of the two parties may be found to constitute a "waiver" of this provision, and recovery can be allowed the contractor, notwithstanding that no written authorization was given by the owner to perform such additional work.

Pamper Corporation v. Town of Marksville, La.App., 3 Cir., 208 So.2d 715 (1968). Several situations may form the basis for waiver: (1) when the extra work was necessary and had not been foreseen; (2) when the changes were of such magnitude that they could not be supposed to have been made without the knowledge of the owner; (3) when the owner was aware of the additional work and made no objection to it; and (4) when there was a subsequent verbal agreement authorizing the work. Roff v. Southern Construction Corporation, La.App., 3 Cir., 163 So.2d 112, 115–116 (1964).

■ In a letter of April 23, 1966, during the period in which the breach occurred, Gulf States, through its engineers, indicated to Harrison that no extension of time for delay would be permitted and directed it to provide additional manpower and equipment to maintain the original work schedule. Then, at a meeting on August 11, 1966, Harrison advised Gulf States that additional costs were being incurred because of Gulf States' delays. It is apparent, therefore, that there was waiver of the notice requirement by Gulf States because it was aware of the additional work and made no objection to it. *See* Well-

man v. Smith, 114 La. 228, 38 So. 151 (1905); Groner v. Cavender, 16 La.App. 565, 133 So. 825 (2 Cir. 1931).

 We also reject Gulf States' assertion that a new trial should be granted because the district court did not instruct that prior notice was a prerequisite to recovery. Legal agreements have the effect of law as between the parties, and the courts are bound to give effect to contracts according to the intent of the parties. LSA–Civil Code, Article 1945; Welch-Eckman Const. Co. v. Vancouver Plywood Co., La.App., 3 Cir., 213 So.2d 134, 135 (1968). In the law of contracts (or conventional obligations), however, a distinction is properly drawn between the interpretation and the construction of written instruments. The process of construction entails the determination of the legal operation of the language of a contract, and is peculiarly a function of the court. Interpretation, on the other hand, commonly refers to the search for the meaning of the words used and is a factual matter within the province of the jury. *See* 3 A. Corbin, Contracts §§ 534, 554 (1960); 4 S. Williston, Contracts §§ 602, 616 (Jaeger ed. 1961); Williams v. Humble Oil & Refining Company, 5 Cir., 1970, 432 F.2d 165, 179, cert. denied, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 ⟨1971). The dispute before us is clearly one of interpretation of the contract. The question of the applicability of the notice provision was properly for jury determination, and the trial court, therefore, did not commit error in failing to instruct the jury that prior notice was a prerequisite to recovery.

B. The Letter of April 24, 1967

 Construction of the transmission line was essentially complete on April 1, 1967. In compliance with the contract, Harrison, at a meeting on April 24, 1967, submitted its remaining claims for "extra work" requested by Gulf States during the performance of the contract. These specific extras were itemized on a written schedule. In return for additional compensation of $89,882.76, Harrison then executed a let-ter of April 24, 1967 from Gulf States, which provided in part:

> In accordance with our conversations and discussions held in the offices in Baton Rouge on April 24, 1967, the attached is a summary of the agreed upon resolution of all outstanding claims for additional compensation, over and above the unit prices provided by the Contract which have been or may be presented for extra work of any nature, performed prior to April 1, 1967, by Nat Harrison Associates, Inc., and its subcontractors
> · · · ·

Gulf States contends that execution of this letter by Harrison constituted a release of all claims, including those in dispute here. Harrison contends that the payment was for "extra work" under the contract and was confined to those claims itemized in the letter and did not cover the claim for damages for acceleration and breach of contract. The court below submitted the issue to the jury with instructions that the jury determine the meaning of the parties with respect to the agreement.

As was the case with the written notice provision, the question is one of the interpretation of the meaning of the language used in the agreement and was properly submitted to the jury. *See* page 584 *supra.* We cannot say as a matter of law that the letter was a release of all outstanding and future claims of Harrison against Gulf States.

Alternatively with respect to the release, Gulf States claims that the lower court erred in failing to give an instruction on estoppel, to the effect that Harrison was under a legal obligation to mention specifically this claim and bring it to the attention of Gulf States at the meeting of April 24, 1967.

 In order for the doctrine of estoppel to apply, there must be an affirmative showing of representation, reliance, and detrimental change of position by the person invoking the doctrine. *See, e. g.,* Shirey v. Campbell, La.App., 2 Cir., 151 So.2d 557 (1963); Olin Gas Transmission Corp. v. Harrison, La.

App., 1 Cir., 132 So.2d 721 (1961). The evidence does not support Gulf States' contention that Harrison represented that its claim for acceleration or for breach of conduct was included in the claims presented at the April 1967 meeting. The district court's failure to instruct on estoppel was not error.

## II.

Gulf States contends that the evidence and formulae introduced at trial to prove damages provided no appropriate basis for a damage award to Harrison.

In its complaint, Harrison alleged damages of $1,200,000 resulting from the acceleration and breach of contract. At trial, Harrison offered three alternative measures of damages. Harrison's first alternative resulted from the district court's order, in the course of the discovery proceedings, that Harrison submit a complete itemized account of the claim:

It is further ordered that plaintiff present—prepare and present to defendant a complete—total and complete itemized account of their claim. This itemization will be prepared in the following fashion:

It will state sentence by sentence each individual item claimed in damages, together with the explanation of why it is due and how the figure is arrived at. I don't want a narrative type statement; I want it sentence by sentence, one, two, three, four, so that each sentence may be answered by the defendant individually.

A second order of the trial court again required itemization and, as a result, Harrison submitted a table, set out in the margin,[1] showing the relationship

1.

| | Beginning Through May 31, 1966 | June 1, 1966 to End of Job | Total Job |
|---|---|---|---|
| DIRECT LABOR: | | | |
| Nat Harrison Associates, Inc. | $ 636,609.01 | $ 663,158.07 | $1,299,767.08 |
| American Piling | 587,547.38 | 351,652.35 | 939,199.73 |
| Jackson Morgan | 180,019.82 | 495,160.20 | 675,180.02 |
| Total | $1,404,176.21 | $1,509,970.62 | $2,914,146.83 |
| INCOME: | | | |
| Progress Estimates through #14 (May 31, 1966), and all other Income to May 31, 1966 | $4,147,732.11 | | |
| Total Income from May 31, 1966, to Date | | $3,402,925.03 | |
| Total Income From All Sources on Job | | | $7,550,657.14 |
| EFFICIENCY: | | | |
| Each $1.00 of Job Progress (Income) had direct labor cost of | .3385 | .4437 | |
| Loss of Labor Efficiency | .4437 .3385 | | |
| Dollar Loss of Labor Efficiency | .1052 or | | 31.08% |

We note that Harrison arrived at the percentage loss of efficiency, 31.08 per cent, by dividing the dollar loss of labor efficiency, .1052, by the direct labor cost per $1.00 of job progress prior to June 1, 1966, .3385.

between labor costs and income both before and after June 1, 1966, the date on which damages allegedly began to occur. In basing its computation of damages on this table, Harrison assumed that the contract here was essentially a labor contract. The claimed percentage loss of labor efficiency after June 1, 1966, 31.08 per cent, was then multiplied by the total wages of Harrison and its two subcontractors from June 1, 1966, to the end of the job, $1,509,970.62, to arrive at a figure of $469,298.87. In addition to this labor loss of efficiency, Harrison claimed lost payroll taxes, insurance, and labor benefits of 14.25 per cent of direct labor, or $66,875.09. Equipment costs were computed at 30 per cent of direct labor with additives, or the sum of $160,852.19. Small tools and supplies costs were claimed at 5 per cent of direct labor with additives, or $26,808.70. Total direct costs claimed thus amounted to $723,834.85. Fifteen per cent of this total direct cost was allocated for overhead, an indirect cost. This amounted to $108,575.25, for a total cost of $832,410.08. Finally, Harrison added 10 per cent of total cost $83,241.01, as its profit and thus arrived at a total claim of $915,651.09.

Over the objections of Gulf States, Harrison at the trial introduced the above data in evidence in connection with the testimony of a certified public accountant. Harrison also presented at the trial several large boxes containing its payroll records, which had been examined by the accountant in determining his estimates of Harrison's damages. The court instructed the jury that they might examine the records, but they did not do so.

As another method of computing damages, Harrison's accountant presented a calculation based on the average daily payroll figure (that is, direct daily labor cost) of Harrison and its two subcontractors for the period from June 1, 1966, through October 19, 1966, the lat-ter being the approximate date on which line 342 was completed. This average daily payroll figure, $7,662.81, was multiplied by 42, allegedly the number of days for which valid extensions of time for performance of the contract were ignored or refused. To that figure, $321,838.02, percentages were added to cover payroll taxes, equipment, small tools and supplies, etc., in the same manner as the first method. The total claim computed by this method was $627,884.-55.

Harrison's third method of computing damages involved a comparison of the highest, $567,675, of Harrison's original five bids on the line 342 underbuild with a revised bid of $361,321, made by Harrison after further negotiation. The revised bid was made on the basis of a more relaxed delivery and completion schedule. Harrison computed its "base" damages under this method at the difference between its highest bid and the revised bid, $206,354, plus a profit factor of 10 per cent, for a total of $226,989.40.

In connection with the testimony of a certified public accountant, Gulf States also introduced evidence on damages, in the form of a comparison of the efficiency of the Harrison operation prior to and after June 1, 1966. Gulf States' evidence was much the same as Harrison's except that Gulf States included in its comparison the cost of materials purchased by Harrison.[2] Gulf States' calculations indicated that during the period after June 1, 1966, Harrison's operation was 2.03 per cent more efficient than during the prior period and that actual material and labor costs after June 1, 1966, were $68,861.40 less than for the prior period.

The jury was instructed that damages must be reasonable and may not be speculative; but that damages need not be calculated to a mathematical certainty. The jury was also instructed that Harrison could recover only on its losses and

2. The cost of these materials was said to be $1,022,530.63. Of this, $796,110.92 was allocated for materials costs prior to June 1, 1966 while the remainder, $226,419.71, was allocated to the period from June 1, 1966, to the end of the contract.

not any losses suffered by the subcontractors.

■ Ordinarily, damages due for breach of contract are those that may reasonably be considered as arising from the natural and proximate consequences of the breach. Article 1934 of the Louisiana Civil Code provides that in actions for breach of contract the measure of damages is the amount of loss sustained and the profit deprived.

■ ■ Actual damages must be proven; they cannot be merely speculative or conjectural. Brown v. Producers' Oil Co., 134 La. 672, 64 So. 674, 677 (1914); State v. Bell, 153 La. 823, 96 So. 669, 671 (1923). While the breaching party should not escape liability because of difficulty in finding a perfect measure of damages, the evidence must furnish data for a reasonably accurate estimate of the amount of damages. State v. Bell, *supra*; Manuel v. Texas Gas Transmission Corporation, La.App., 3 Cir., 153 So.2d 157 (1963); 11 S. Williston, Contracts § 1345 (Jaeger ed. 1968). It must appear reasonably evident that the amount allowed rests upon a certain basis. *See* Brown v. Producers' Oil Co., *supra*.

■ The amount and measure of damages must be determined in relation to the particular contract in issue and the circumstances surrounding its breach. The question of the certainty of proof of damages becomes a matter for decision in each individual case. *See* Jolley Elevator Co. v. Schwegmann Bros. Giant Super Mkts., La.App., 4 Cir., 230 So.2d 640, 643 (1970). In the case before us, Harrison's three alternative methods of computing the same damages resulted in the jury's receiving the following estimates of Harrison's injury: $915,651.09, $627,884.55, $226,989.40. Gulf States, on the other hand, contends that Harrison was actually more efficient during the period of the breach than it was during the running of the contract up to the beginning of the breach. The jury, as we have noted, awarded Gulf States $225,000.

■ In order for it to recover, it is incumbent upon Harrison in an action such as this to show that it was put to actual additional expense as a result of Gulf States' acceleration and breach of contract. Since Harrison must prove that increased costs resulted, Harrison's contemporaneous records kept in the course of the contract's performance are clearly the best evidence available to show actual additional costs. Yet the record offers very little evidence to show what acceleration in fact occurred after June 1, 1966, due to the actions of Gulf States. No significant showing was made at trial that Harrison in fact had any particular amount of overtime caused by any action of Gulf States; nor is there specific evidence to establish that during any particular period of time Harrison employed more men or equipment than would have been employed absent the breach and acceleration.

Harrison's proof relies only on generalizations about its overall operations and not on any loss caused by a particular action of Gulf States. There is in the record no testimony to the effect that such specific costs either could not be shown or are not available, and it does not appear to us that the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy.

Furthermore, damages computed by any one of the three formulae would permit Harrison to recover for losses that may have been incurred by the two subcontractors involved in the work done under the contract. The computations include both costs incurred by the subcontractors and revenues attributable to them. Nothing in the record indicates that Harrison may recover its subcontractors' alleged increased costs due to lack of efficiency. While it is true that the district judge instructed the jury that Harrison could recover only its loss and not any loss of its subcontractors, this instruction does not remedy the very real defect in Harrison's evidence, its failure to distinguish between Harri-

son's own losses and losses suffered by the subcontractors.[3]

We do not imply that in considering the measure of damages absolute accuracy is a precondition to Harrison's recovery. But the burden of proving damages is not carried merely by general assertions, without foundations, that acceleration and actual losses did occur and were due to the conduct of Gulf States. *See* International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201, 205. Under the circumstances presented, the interests of justice are best served by setting aside the award of damages and remanding this case to the district court for a new trial on the issue of the amount of damages to be recovered by Harrison for the acceleration and breach of contract by Gulf States. *See* Kent v. Flickinger, 10 Cir., 1972, 453 F.2d 955.

### III.

In view of our decision with respect to the jury's award of damages, we express no opinion on Gulf States' challenge to the propriety of the trial court's award of interest on the judgment from the date of acceptance of the contract. We do, however, reach the question whether the trial court properly awarded attor-

neys' fees on the retainage for which partial summary judgment was granted.

Section 18 of the contract between Gulf States and Harrison provides:

> In case it should ever become necessary for either party hereto to employ an attorney at law to enforce any of the obligations assumed hereunder by the opposite party herein, and should recovery be had by such complaining party against the opposite party, then such party against whom such recovery is made agrees to pay to the other a reasonable sum as attorney's fees, which sum shall not be less than ten per cent (10%), nor more than twenty per cent (20%), of the amount of any such recovery (excluding court costs, however).

At the trial counsel for both parties stipulated that attorneys' fees, if due, be fixed at 15 per cent. The district court awarded attorneys' fees to Harrison both on the judgment for acceleration and breach and on the retainage judgment.

 It has long been the general rule that attorneys' fees may be recovered as an item of damages where specifically authorized by statute or by

---

3. A major defect in Harrison's first method of computing damages, the comparison of labor efficiency prior to and during the breach, with additives for other elements, is that it lacks proof of causation. As we have noted, Harrison can recover only for costs flowing from Gulf States' acceleration and breach of contract. Harrison, however, by use of its proposed formula, charges Gulf States with responsibility for all of its alleged loss of labor efficiency during the period in which there was breach and acceleration of the contract. Efficiency of labor, though, can be affected by many factors. There is a failure to show that no substantial part of Harrison's added cost of performance was chargeable to nonactionable causes rather than to the conduct of Gulf States.

Harrison's second method of computing damages, the multiplication of the daily payroll figure by 42, plus additives, is also inadequate. First, it is not at all settled that Harrison was entitled to extensions of time for the days requested or that Harrison was, in fact, unable to work on those days. Second, assuming Harrison did not work on those days, we fail

to comprehend how the multiplication of an average daily payroll figure by the number of days Harrison's operation was idle can be used to arrive with any reasonable certainty at Harrison's damages due to the acceleration and breach by Gulf States. It was not shown, for example, that the refusal of 42 days in extensions resulted in the equivalent of an extra 42 days in performance costs.

Our initial objection to Harrison's third method of computing damages, the difference between their highest bid for the underbuild and the revised bid, is that its basis is a total cost theory in a situation calling for specific costs. In addition, this third method also runs into the problem of causation. Although Harrison argues that this method properly computes damages because its highest bid was based on a compacted delivery schedule and its revised bid related to an extended delivery schedule, it was never shown that the compacted delivery schedule bore any relation to the schedule that was followed as a result of Gulf States' breach and acceleration or that additional costs attributable to the differences in the delivery schedules were similar.

contract. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717–718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967) ; Washington Aluminum Co. v. Pittman Construction Co., 5 Cir., 1967, 383 F.2d 798, 805; Chauvin v. La Hitte, 229 La. 94, 85 So.2d 43, 45 (1956). The district court's finding that attorneys' fees were allowable under the contract on the judgment for retainage is not clearly erroneous. *See* Washington Aluminum Co. v. Pittman Construction Co., *supra.*

In sum, we hold that the judgment of the district court, insofar as the liability of Gulf States for acceleration and breach is concerned, is affirmed; the judgment as to attorneys' fees on the retainage is affirmed; the portion of the judgment awarding damages to Harrison is reversed, and the case is remanded to the district court for a new trial on this issue alone.

Affirmed in part, reversed in part and remanded.