A. L. ROWAN, et al.

v.

Patricia HARRIS, Etc.

Civ. A. No. 78–1602.

United States District Court, E. D. Louisiana.

Feb. 26, 1982.

\* \* \* \* \* \*

Douglas S. Draper, New Orleans, La., for plaintiffs.

Paula M. Potoczak, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Plaintiffs in this action are A. L. Rowan and Robert L. Rowan, individually and as partners in A. L. Rowan & Son, General Contractors, a Louisiana partnership.

2. Defendant in this action is the Department of Housing and Urban Development (hereinafter referred to as "HUD"), an agency of the United States Government.

3. A. L. Rowan & Son (hereinafter referred to as "Rowan") was the general contractor for the Pontchartrain Union Apartments, a 56-unit housing project located in Gretna, Louisiana. Rowan's contract was with Pontchartrain Union, a non-profit organization, as owner. Charles E. Curry Company, Inc. was the mortgagee for the construction project, and HUD insured the mortgage under the National Housing Act,

12 U.S.C. §§ 1701–1750g. Although HUD was not a party to the building contract, under the provisions of the Act, HUD controlled the payment of contract funds through its inspections and supervision of the project. HUD became further involved in the construction project when Pontchartrain Union defaulted on the mortgage. Curry exercised its option under the National Housing Act and assigned the note and the mortgage securing the note to HUD.

4. The construction contract between Rowan and Pontchartrain Union was signed on April 29, 1971, and the contemplated date of completion of the project was April 1, 1972. The project, however, was not substantially completed until June 18, 1973, at which time HUD approved the issuance of a certificate of substantial completion.

5. Upon issuance of the certificate of substantial completion, plaintiffs demanded from HUD the retainage withheld on the construction contract. HUD refused to pay the retainage, however, because there was no cost certification by the original mortgagor, Pontchartrain Union, as required by the contract. In a previously filed action, Rowan sued HUD to recover this retainage of more than $92,000. In summary judgment proceedings, the court awarded Rowan $94,092.29, representing the retainage plus interest. *A. L. Rowan & Son, General Contractors, Inc., et al. v. Charles F. Curry Company, Inc., et al,* Civil Action No. 75–3807 (E.D.La. Sept. 27, 1977).

6. Prior to the signing of the building contract in April 1971, Rowan met with various HUD employees. In spite of Rowan's alleged request for assurances that all payments would be promptly made before the tenth of each month and that cost overruns would be paid, the contract includes none of these provisions. Nevertheless, the contract was executed and Rowan commenced work on the project.

7. As evidenced by HUD inspection reports, inspections were performed beginning in mid-May 1971, and continued through May 1973. These inspections were performed almost entirely by one HUD em-

ployee, Charles M. Rodi. Mr. Rodi, a HUD witness, testified that he had no recollection of these inspections independent from the reports. The visits to the project site were consistent and frequent; a total of 37 inspections were performed during this two-year period.

8. From the very beginning Rowan encountered problems with the Pontchartrain project. Just about two months into the project, in mid-August, 1971, progress on the job was reported as slow. A city-wide concrete strike, which was to last about forty-five days, forced a work stoppage on the project. Several days work was lost due to unusually heavy rains.

9. At the same time, however, Rowan encountered problems that resulted, either directly or indirectly, from Rowan's own actions. One such recurring problem was HUD's rejection of Rowan's requests for monetary draws due to Rowan's repeated failure to justify the amount of money requested on the basis of completed work. Although HUD advised Rowan that proper substantiation of the requests was critical to the payment of construction funds, in one instance, Rowan's unjustified requests resulted in a delay in payment of almost three months.

10. The inspection reports also reveal that corrections were required in many cases to bring work already completed on the project up to HUD standards.

11. In August 1972, the HUD inspection revealed a lack of supervision on the job. Later that month, a shortage of workers resulted in an unsatisfactory slow rate of progress. This shortage of workers continued through October.

12. In November 1972, although plumbers and metalworkers were at work on the project, other crafts left the job and refused to return until they were paid. Later, in December 1972, the job was closed down after a period of virtually no activity since the beginning of November.

13. In an attempt to get the project moving and completed, Carl Geyer, HUD's Assistant Director of Technical Services, met with Rowan and the various subcontractors. As a result of the meeting, the mortgage on the project was increased by $66,000, the time for completion of the project was extended, and reserve funds necessary for completion were restored. A. L. Rowan testified that the only reason he resumed work on the project was because he had been assured by Geyer at this meeting that the cost overruns incurred by Rowan would be paid at the completion of the project. Carl Geyer testified that he did not make any representations to Rowan that cost overruns would be approved. Geyer further testified that he was not authorized to make such representations because he was subject to a HUD policy directive that prohibited payment of cost overruns. No written agreement was ever entered into concerning the cost overruns. I do not find that HUD, through Geyer, approved cost overruns.

14. Because Rowan lacked the funds to complete the project, Rowan obtained a loan from the Ouachita Bank in Monroe, Louisiana, using the project as security. Because some of the subcontractors would not return to work until they received payment for completed work, Rowan used the loan funds to pay these subcontractors.

15. In March 1973, there was once again a reported problem with the request for payment submitted to HUD. Intermittent periods of no work activity occurred throughout the remainder of the project.

16. The worker shortages and the slow progress on the Pontchartrain project noted during the frequent HUD inspections were the symptoms of much more pervasive troubles affecting Rowan's business. When Rowan first started the Pontchartrain project, the partnership was still heavily financially committed to the completion of a large turnkey project in Breaux Bridge, Louisiana. The contract price of the 100-unit Breaux Bridge project was $1.2 million and was much larger than any of the small home and church construction projects Rowan had undertaken previously. By undertaking the 56-unit, $833,000 Pontchartrain project while still committed to the

Breaux Bridge project, Rowan overextended its capabilities.

17. James F. Pinner, a C.P.A. called by plaintiff as a financial expert, testified that the Rowan partnership was very thinly capitalized. Rowan's capital remained approximately $50,000 to $60,000 while the partnership continued to take on more and more jobs. Because of this thin capitalization, it became critical for Rowan to receive completed work payments frequently and rapidly. Delays in payment, in the words of plaintiff's witness, forced Rowan "to start robbing Peter to pay Paul."

18. When HUD withheld from Rowan the retainage due to the lack of the required cost certification, Rowan suffered by not having that amount of money available to pay the subcontractors. However, the loss of use of these funds was only one of many factors leading to Rowan's financial decline. By the end of the Pontchartrain project, Rowan's cost overrun amounted to $121,000. This large cost overrun contributed to Rowan's financial problems, as was substantiated by plaintiff's expert. The delays in the completion of the project further aggravated Rowan's financial strain.

19. While still in the aftermath of the Pontchartrain project, Rowan engaged in three more substantial construction projects: a funeral home in Monroe, Louisiana (contract price approximately $285,-000); a church in Shreveport, Louisiana (contract price approximately $405,000); and a church in Baton Rouge, Louisiana (contract price approximately $475,000). Due to plaintiff's cash flow problems, these three projects were completed by Rowan's bonding company.

20. Before Rowan's involvement with the Pontchartrain project, the partnership had a substantial bonding capacity. By the time the three projects noted above had finally been completed, the partnership had a bonding capacity of zero, that is, Rowan could not obtain a bond for construction work. Rowan subsequently went out of business.

21. Neither plaintiff's nor HUD's financial expert witnesses were able to quantify the dollar effect that the withholding of the retainage had on Rowan's business. Moreover, the collective testimony of the experts demonstrated that, in terms of Rowan's declining and ultimately hopeless financial situation, it was impossible to isolate the effects of the withholding from Rowan's cost overruns and thin capitalization.

### Conclusions of Law

1. This court's jurisdiction over the subject matter of this lawsuit has been argued and reargued, first on HUD's motion for summary judgment and later after their request for reconsideration of the earlier motion. This court has jurisdiction over the subject matter of this lawsuit under 12 U.S.C. § 1702.

2. Rowan has brought this action seeking to recover damages for loss of use of funds, loss of future profits, loss of bonding capability, and loss of reputation allegedly arising from HUD's wrongful withholding of the $92,000 retainage and from HUD's alleged assurances that cost overruns would be paid for. Specifically, Rowan's claim "arises out of the alleged breach of an obligation based upon equitable rights generated by HUD's course of activities."

3. Aside from its jurisdictional challenges, HUD contends that by having already recovered the amount of the retainage plus interest in a previous action, Rowan has no legally cognizable claim to recover anything more under Louisiana law. HUD further contends that the damages sought by Rowan are speculative, and that HUD did not breach any duty owed to plaintiffs in this action.

4. The previous action between Rowan and HUD disposed of the issue that HUD did not have a right to permanently withhold the retainage.

5. The evidence fails to reveal any acts of bad faith committed by HUD which give rise to a theory of liability. By withholding the balance due on the construction contract for lack of the original mortgagor's cost certification, HUD was acting consistent with the terms of the contract

which Rowan signed, and with the provisions of the applicable federal regulations. 24 CFR § 221.547–.558. A subsequent ruling that HUD was not entitled to permanently withhold the retainage does not establish bad faith on the part of HUD. To the contrary, the evidence shows that HUD attempted to aid Rowan in completing the project by extending the time period for the mortgage, by restoring reserve funds, and by extending the time for the project's completion. Such a pattern of behavior does not support a finding that HUD acted in bad faith.

6. Assuming, arguendo, that HUD affirmatively represented to Rowan that all cost overruns would be paid at the completion of the project, or in some other manner gave rise to quasi-contractual rights in Rowan's favor, my inquiry necessarily turns to the issue of causation—did HUD's alleged actions *cause* the financial damage suffered by Rowan? The evidence shows that Rowan over-extended itself by undertaking the Pontchartrain project while still financially involved in another major construction project both of which exceeded the range of the partnership's usual practice. The evidence also shows that Rowan's very thin capital base both caused and severely aggravated whatever cash flow problems Rowan otherwise would have suffered. The HUD inspections revealed poor supervision of the project and lead me to the conclusion that the project was being poorly managed. Rowan's own failure on several occasions to properly justify its requests for monetary draws directly resulted in delayed payments to its subcontractors for completed work. This serious financial and managerial instability that plagued Rowan throughout the Pontchartrain project lapsed over into Rowan's next three construction projects which, in turn, resulted in financial losses for Rowan. In light of these facts, I cannot conclude that the damages complained of by plaintiff were proximately caused by HUD. Nor can I conclude that the damages sought by plaintiff, particularly the loss of future profits, were reasonably foreseeable as a consequence of the HUD's withholding of the retainage.

Such losses, which are incapable of being attributed solely or directly to HUD's withholding of the retainage, resulted from the numerous superceding events already described which reasonably could not have been foreseen by HUD.

7. A claim for damages in contract or equity, cannot be based upon speculation or conjecture. *Nat Harrison Assoc., Inc. v. Gulf States Utilities Company,* 491 F.2d 578, 587 (5th Cir. 1974); *Liberto v. Villard,* 386 So.2d 930, 935 (La.App.3rd Cir. 1980). Although mathematical precision is not required, the damages sought by Rowan have not been established with any degree of certainty. With regard to plaintiff's claim for inability to get new bonds, loss of future profits, and loss of reputation, no evidence has been presented to show what these lost profits were, or what jobs Rowan was not able to bid on or obtain as a result of financial difficulties. Nor was evidence presented as to the profits actually lost as a result of the retainage from the three constructions projects undertaken subsequent to the Pontchartrain project. Similarly, the claim for loss of reputation in the business community has not been substantiated.

8. In light of the above noted shortcomings of the evidence, Rowan's claims for damages must fail.

Defendant is directed to prepare and submit a judgment consistent with these findings and conclusions.