416 So.2d 139 (1982)
DIXIE LIFE INSURANCE COMPANY
v.
PACIFIC MUTUAL LIFE INSURANCE COMPANY and Harold J. Jones.
No. 12814.
Court of Appeal of Louisiana, Fourth Circuit.
May 11, 1982.
Rehearings Denied July 16, 1982.
Phelps, Dunbar, Marks, Claverie & Sims, Harry A. Rosenberg, John J. Weiler, New Orleans, for plaintiff-appellee.
Chaffe, McCall, Phillips, Toler & Sarpy, Harry McCall, Jr., Norris S. L. Williams, New Orleans, for defendant-appellant.
Before GULOTTA, SCHOTT and GARRISON, JJ.
*140 GULOTTA, Judge.
Pacific Mutual Life Insurance Company (Pacific) and Harold J. Jones, an insurance agent, appeal from a $278,500.00 jury verdict in favor of Dixie Life Insurance Company (Dixie),[1] for damages resulting from Pacific's error in calculating the cost of a pension plan purchased by Dixie. We reduce the award to the sum of $99,902.00 against Pacific, and dismiss plaintiff's suit against Jones.
Dixie had an existing pension plan with the Home Life Insurance Company, but a proposed Pacific plan dated September 28, 1973, which Jones submitted to Dixie, provided greater employee benefits at less employee costs.[2] Coverage by Pacific to Dixie began April 1, 1974.
In August, 1974, Pacific discovered a major error in the proposal whereby Dixie's annual contribution for the first year had been understated as $8,801.00 instead of $17,603.00, because its "unfunded supplemental liability" under the plan had been misstated as $13,522.00 instead of $132,874.00.[3] Although Pacific notified the Jones agency in August, 1974 regarding the mistake, it was not until July 31, 1975 that Dixie was made aware of the error.
On October 29, 1975, Winston C. Profio, Pacific's pension director, outlined in a letter to Charles J. D. Gerrets, III, Dixie's president, three options available to Dixie to resolve the problem: 1) to provide lower benefits similar to the previous insurer's plan with employer and employee premiums in an amount approximating those paid to the prior insurer; 2) to terminate the Pacific insurance coverage with a refund to Dixie of accumulated deposits plus accrued interest; or 3) to accept the higher costs for the Pacific coverage. Accepting the third option under protest, Dixie continued the Pacific coverage. This suit followed.
The $278,500.00 award was in conformity with the testimony of Dixie's actuary, William H. Blount. According to Blount, this amount represents the difference between the accrued and future costs between the Home Life and Pacific Mutual plans.[4]
Defendants argue in this appeal that the trial judge erred in failing to instruct the jury on plaintiff's duty to mitigate damages. According to defendants, Dixie could have simply amended or terminated the Pacific plan and provided a lower level of benefits instead of maintaining the Pacific plan requiring increased contributions, as Dixie chose to do. In this connection, defendants *141 argue the trial judge should have instructed the jury on the applicable federal pension law, the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S. C.A. Sec. 1001 et seq., which sets forth restrictions on an employer's right to reduce or terminate employee benefits.
Defendants further contend the award is manifestly erroneous because Dixie failed to show it was prejudiced by defendants' delay in notifying Dixie of the error. According to defendants, the effect of the jury's verdict is to give Dixie all of the benefits of the Pacific Mutual plan at the erroneously stated amount of the September 28, 1973 proposal when Dixie could have reduced the benefits or terminated the Pacific plan.
Lastly, defendants point out that the verdict was "tainted" because, during deliberations, the jury referred to a chart used by plaintiff's actuary.
In answer to the appeal, Dixie seeks an increase to the sum of $301,240.00. According to Dixie, because of the pending suspensive appeal, a request for permission to reduce benefits or terminate the Pacific plan (under ERISA) could not be submitted to be effective before April 1, 1981. Dixie contends, therefore, that an additional year of accrued costs should be included in the total award.

JURY INSTRUCTIONS
Pacific timely made a blanket objection to the trial judge's failure to give the requested charges, but did not assign the grounds for these objections. We are cognizant of plaintiff's argument that defendants have waived their rights to raise an objection in this court concerning the jury instructions by their failure to raise a specific objection in the trial court.[5] However, LSA-C.C.P. Art. 2164 mandates that the appellate court shall render any judgment which is "just, legal and proper upon the record on appeal." The "Official Revision Comments" to this codal provision state that the purpose of the article "is to give the appellate court complete freedom to do justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below." Reading this article, together with the Louisiana Supreme Court's judgment in Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975),[6] when the entire record is before the court and the question raised is crucial to the resolution of the litigation, we are compelled to consider the issue of the failure of the trial judge to give requested instructions.
Turning now to the merits of defendants' contention, we conclude the trial judge erred in failing to instruct the jury concerning the Employee Retirement Income Security Act (ERISA) and its applicability to Dixie's pension plan.
This federal statute prohibits an employer from unilaterally reducing or terminating "vested" or "non-forfeitable" employee benefits unless the United States Department of Labor gives permission based on a showing of "unreasonable" hardship. See Nachman Corp. vs. Pension Ben. Guaranty Corp., 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).
29 U.S.C.A. Sec. 1061(b)(2) [ERISA] provides further that "... in the case of a plan in existence on January 1, 1974, the amendment made by this part [of ERISA] shall apply in the case of plan years beginning after December 31, 1975." Further, the Nachman decision makes it clear that ERISA's provisions concerning termination and *142 amendment only apply to "vested" or "non-forfeitable" employee benefits. It is apparent, therefore that ERISA does not prohibit amendment or termination of plan benefits that are not "vested."
In our case, Pacific's plan expressly states that it is effective on April 1, 1973 and "... shall be deemed a continuation of the plan of benefits in effect prior to April 1, 1973 [the Home Life Plan] and not a new plan...." The Home Life Plan, implemented by Dixie on April 1, 1971 and amended by the Pacific Plan, provides for a five-year vesting period. According to the plan, an employee whose employment was terminated before five years of coverage under the plan was only entitled to receive his accrued contributions as of termination in one lump sum payment, whereas an employee terminating or retiring after five years coverage under the plan was entitled to retirement benefits payable after age sixty-five in accordance with the plan's schedule. When we consider the provisions of the plan together with the ERISA statute, we are led to conclude that Dixie had a plan in effect on January 1, 1974, and would have been permitted to reduce benefits if it had acted before April, 1976.
Clearly then, ERISA has applicability in the determination whether Dixie had the right to terminate or reduce employee retirement benefits, and, under the circumstances, we conclude the failure to give the required charges Nos. 1 and 6[7] constituted prejudicial error resulting in a disproportionate jury award in favor of Dixie. We do not imply the jury erred in awarding Dixie a judgment against Pacific; rather, our finding of error concerns the amount of that award.
It is undisputed that the error in misstating Dixie's first annual contribution to maintain benefits under the Pacific plan was a unilateral one by Pacific Mutual and not the responsibility of Dixie. Moreover, it does not appear that the error is one of fact concerning the principal cause that would vitiate the contract under LSA-C.C. Arts. 1812, 1821, 1823 and 1825. Accordingly, it appears there is a valid and binding contract. The more perplexing question, however, is whether Dixie has been damaged by Pacific's refusal to carry out the contract terms and, if so, to what extent.

DAMAGES
In this respect, Dixie claims that Pacific's delay in informing Dixie of the error forced plaintiff to maintain the more expensive Pacific plan for its employees. Also, according to Dixie, if it became necessary to reduce the pension benefits, employer-employee relations would be adversely affected.
In support of this claim, Dixie's president, Charles J. D. Gerrets, III, testified that he had emphasized to Jones that Dixie could afford only "a few dollars a year" to maintain the plan and that if the true annual cost had been presented to him in 1973 he would not have accepted the plan.
According to Gerrets, the alternative of reducing employee benefits was not feasible *143 because it might "wreck" or upset his company by tearing down the good will and security given his employees under the Pacific plan. Gerrets stated that it would have been "peculiar" to increase the morale of his employees and then "tear it down and start all over again". His testimony was corroborated by that of his father, Charles J. D. Gerrets, Jr., Dixie's chairman of the board, who was of the opinion that he would have lost many or most of his employees had he reduced benefits to the Home Life level.
The jury had the benefit of the additional testimony of two Dixie employees. Neal C. Bell, a sixty-five-year-old retiree, testified that he and his fellow employees had agreed that they were "much better off" with the Pacific plan after Jones had handed them summaries of benefits under the new plan. He stated that he would not have been able to retire if the benefits had later been reduced to the Home Life formula. C. J. Williams, a sixty-five-year-old sales manager of Dixie, testified that amendment of the Pacific plan back to the Home Life formula would have affected his anticipated retirement and he would have been forced to sue Dixie in order to assure benefits would remain at the Pacific plan level.
The testimony considered, we conclude Pacific's error caused Dixie to obtain an employee retirement plan requiring additional expenditure that it was neither desirous of nor prepared to incur, and that a reduction of benefits would have, more probably than not, adversely affected employer-employee relations. We conclude Dixie has made a showing of damage.[8]

QUANTUM
Whether the error is viewed as negligence or breach of contract, Dixie bears the burden of proving the extent of damage and can recover only actual, not speculative or conjectural damages. Brown v. Producers' Oil Co., 134 La. 672, 64 So. 674 (1914); State v. Bell, 153 La. 823, 96 So. 669 (1923). Nevertheless, where there is a right to recovery but an exact estimate of damages cannot be made, the Court has discretion to assess damages based upon all the facts and circumstances of the case. Manuel v. Texas Gas Transmission Corporation, 153 So.2d 157 (La.App. 3rd Cir. 1963).
The jury award, in part, is based on future speculative costs for funding the Pacific plan. The award disregards the continually changing amount of Dixie's future annual contributions, depending on the number of employees, their ages, their pay and the rate of interest earned by the plan. We conclude, therefore, that the jury's award was clearly wrong insofar as it awarded damages for the cost of funding future benefits to Dixie employees.
We deem the proper measure of damages to Dixie resulting from Pacific's error is the cost to fund the increased level of accrued benefits up to April 1, 1976. Dixie was permitted under ERISA until this date to amend the plan, which had been in effect on January 1, 1974. Blount testified that the sum of $99,902.00 represented the value of accrued benefits as of April, 1976, and we conclude that this amount adequately compensates Dixie for the actual damages suffered.[9]
*144 Having so concluded, no necessity exists to consider the arguments concerning the jury's "tainted" deliberations and plaintiff's answer to the appeal seeking an increase in the award.
At this juncture, we point out that no showing was made that Jones was an agent for Pacific or that the error was made by him. The evidence clearly establishes that Pacific's employees in the actuarial department were responsible for this erroneous calculation. Although it is true that Jones learned of the error in September, 1974 and failed to notify Dixie of it until July 31, 1975, there is no showing that this delay, though inexcusable, caused plaintiff any damage. After learning of the error, sufficient time remained for Dixie to amend the plan prior to April 1, 1976. Accordingly, we find no basis for the jury verdict casting Jones in judgment. We therefore reverse and set aside that part of the judgment in favor of Dixie and against Harold Jones.

DECREE
For the foregoing reasons, the judgment in favor of Dixie Life Insurance Company and against Pacific Mutual Life Insurance Company in the amount of $278,500.00 is amended and reduced to the sum of $99,902.00, with interest from date of judicial demand until paid. Plaintiff's suit against Harold J. Jones is dismissed with prejudice. Costs to be paid by Pacific Mutual Insurance Company.
REVERSED IN PART. AMENDED IN PART, AND AS AMENDED, AFFIRMED.
NOTES
[1] Dixie, an industrial life insurance company primarily writing burial insurance policies, had sixteen or seventeen employees in 1973 and was providing a pension plan to them as a fringe benefit. Dixie had no specialized knowledge about pension plans.
[2] Under the Home Life plan, an employee's monthly retirement benefit was set at $50.00 of the first $500.00 of his average monthly earnings plus 20% of the excess. Under the Pacific plan, the same employee would receive a retirement benefit of $150.00 of the first $650.00 of his average monthly earnings and 30% of the excess. Thus, an employee with an average monthly income of $1,146.00 who retired at age 66, would receive a monthly benefit of $299.00 under Pacific's proposal in contrast to $179.00 under the Home Life plan. The monthly cost to this employee under the Pacific plan was only $81.55 in contrast to a monthly cost of $99.46 under the Home Life plan.
[3] Under the Pacific plan, the annual contribution by the employees remained at the constant rate of 2% of the employees' monthly compensation, but Dixie's annual contribution as employer varied, depending on a number of factors including the number of employees, changes in their compensation, the rate of interest earned by the plan assets, etc.

Dixie was obligated to make contributions in an amount sufficient to fund the employees' benefits, but this annual contribution was actuarily determined for each plan year. For the plan year beginning April 1, 1975, Dixie's recommended contribution to maintain the accrued and future benefits under the plan was $19,701.00; for 1976, it was $26,661.00; for 1977, it was $26,947.00. Dixie's contributions were tax-deductible.
[4] Dixie's actuary, William H. Blount, testified that if Dixie were to amend the Pacific plan in April, 1980, lowering the benefits to the level of the Home Life policy, $163,947.00 would be required to fund the difference in accrued benefits under the two policies, and an additional $114,557.00 would be needed to fund the difference in future benefits. The jury's verdict of $278,500.00 approximates the $278,517.00 total by the actuary.
[5] LSA-C.C.P. Art. 1793 provides, in pertinent part:

". . .
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury." (Emphasis ours.)
Plaintiffs point out that defendants' "blanket objection" to the judge's failure to submit defendants' special interrogatories did not comply with this procedural article.
[6] See also Devillier v. City of Opelousas, 247 So.2d 412 (La.App. 3rd Cir. 1971).
[7] The pertinent requested jury charges read as follows:

"DEFENDANT'S REQUESTED JURY CHARGE NO. 1
Where, as here, no employee benefits were vested prior to 1 April 1976, the ERISA did not prohibit Dixie Life from amending its plan retroactively to reduce employee benefits to a level that could be funded with the contributions set out in the Pacific Mutual proposal to Dixie Life. Nachman Corporation v. Pension Benefit Guaranty Corp., et al, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 CCH Pension Plan Guide, § 22-636 (5-16-80)."
"DEFENDANT'S REQUESTED JURY CHARGE NO. 6
You are instructed that the Federal law, the Employee Retirement Income Security Act, provides in Section 1061 as follows:
`In the case of a plan existing on January 1, 1974, this part shall apply in the case of plan years beginning after December 31, 1975.'
The provisions referred to in Section 1061 are the provisions concerning retroactive amendment of Pension Plans reducing pension benefits to employees.
If you find that the Dixie Life Pension Plan, as amended, was in existence on 1 January 1974, then you are instructed that you are to apply Section 1061 of ERISA, only to plan years beginning after December 31, 1975. This would include plan years beginning 1 April 1976 and all following years."
[8] However, we reject Dixie's contention that Pacific's actions forced Dixie to maintain the more expensive plan. It is sheer speculation that a significant number of employees would have resigned had they been given a full explanation of the nature of Pacific's error and a showing that Dixie was in no way responsible for the error.
[9] During Blount's testimony the following exchange took place:

"Q. When you use the term funding, does that mean what it would take toin today's present cash to have those benefits for Dixie employees at the time of their retirement?
A. Yes. This is awhat we call the present value of accrued benefits, which means it is the value which would have to be deposited or contributed today in order to accumulate, by the time each of these employees reaches retirement age, funds sufficient to pay their benefits.
* * * * * *
Q. So had Dixie been able to amend the plan April of 1976, thatthat figure of $99,902.00 would be what it would take to fund this benefit?
A. That's correct."