428 So.2d 1064 (1983)
Lige DUNAWAY, Jr.
v.
RESTER REFRIGERATION SERVICE, INC., et al.
No. 82 CA 0405.
Court of Appeal of Louisiana, First Circuit.
February 22, 1983.
Rehearing Denied April 6, 1983.
*1066 John M. O'Quinn, Houston, Tex., Vincent J. DeSalvo, George & George, Baton Rouge, for plaintiff-appellee Lige Dunaway, Jr.
Peter T. Dazzio, Watson, Blanche, Wilson & Posner, Baton Rouge, for defendant Rester Refrigeration Service, Inc.
John S. White, Jr., Kennon, White & Odom, Baton Rouge, for defendant-appellant Hearn Const. Co., Inc.
Before COVINGTON, LANIER and ALFORD, JJ.
LANIER, Judge.
This is a suit for damages in tort pursuant to La.C.C. art. 2315 by Lige Dunaway, Jr. against Rester Refrigeration Service, Inc. (Rester) and Hearn Construction Co., Inc. (Hearn). When Dunaway completed presenting his case at the trial, Rester and Hearn moved for directed verdicts. The trial judge granted Rester's motion, but denied Hearn's. The jury rendered special verdicts finding that Hearn was negligent, that Dunaway was not contributorily negligent, that Dunaway "was acting under circumstances of emergency or peril to himself or others such as would render his conduct reasonable under the circumstances", that Dunaway did not assume the risk, and gave a lump sum award for damages of $650,000. The trial court rendered judgment in accordance with the jury's verdicts. This suspensive appeal followed.

I. FACTS
On September 20, 1978, Hearn entered into a contract with the U.S. Department of Health, Education and Welfare for the repair and renovation of three buildings at the U.S. Public Health Service Hospital (Hospital) at Carville in Iberville Parish, Louisiana. In October of 1978, Hearn subcontracted with Rester to do plumbing work in connection with the removal of an old boiler and the installation of a new boiler in building No. 1 on the Hospital premises. Access to the boiler in building No. 1 was through double doors. On either side of the doors were concrete walls approximately three feet wide. The boiler to be removed by Rester was too large to fit through the double doors. Hearn retained the obligation to provide ingress and egress for the old and new boilers. On April 23, 1979, Hearn removed the door jams, transoms and windows at the double doors of building No. 1 to provide the ingress and egress. When Hearn made this opening in the building, it left the steel reinforcing bars (rebars) in the floor and side wall because the building was to be reconstructed when the boiler work was completed.[1]
Dunaway was employed by the Hospital as an operating engineer responsible for supervision of the water, power and sewerage disposal plants and did shift work. On April 24, 1979, Dunaway was walking from the inside of building No. 1 to the outside through the opening made by Hearn when he tripped on one of the rebars in the floor, fell and injured his left elbow and arm.

*1067 II. LIABILITY OF HEARN
It is the duty of one doing construction work to properly label, mark or barricade places in the construction site that present an unreasonable risk of harm to persons using the area. Sullivan v. Gulf States Utilities Company, 382 So.2d 184 (La. App. 1st Cir.1980), writ denied 384 So.2d 447 (La.1980).
William Smith, the foreman for Hearn at this construction site, specifically testified that "... anytime that you have rebars protruding up, you always put up some kind of barricade ..." or a colored ribbon. He further testified that this was done for safety purposes because someone might not see the rebars. The warning barricade or ribbon should be placed after the rebars are exposed. Smith did not recall what type of warning devices were utilized at this construction site, but that some should have been present.
Earnest Swillie, the general superintendent for Hearn at the construction site, testified that Smith's statement about the Hearn policy on tapes and barricades was correct, and that there should have been and were warning devices at the accident site. Swillie observed a two strand black and yellow safety ribbon tape around the construction area on April 23, 1979. There were no barricades or ribbons at the specific site of the accident.
Dunaway testified that there were no barriers, ropes or warning signs around the area or place where the accident occurred. Mitchell Magee testified that he was a Rester employee working in the vicinity of the accident site and that there were no warning devices in place. Magee also testified, without objection, that a "horse" and ribbon were put up after the Dunaway accident. John E. Anderson testified that he also was a Rester employee working in the construction area on the day of the accident and that he observed no warning ribbons.
The jury apparently concluded that the construction work done by Hearn created an unreasonable risk of harm to Dunaway and that Hearn failed to properly mark the construction site with appropriate warning devices. Based on the evidence above set forth, we cannot say that these findings of fact by the jury were clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).

III. CONTRIBUTORY NEGLIGENCE OF DUNAWAY
A pedestrian has a duty to see that which should have been seen. He is not required to look for hidden dangers, but he is bound to observe his course to see if his pathway is clear. A pedestrian is held to have seen those obstructions in his pathway which would be discovered by a reasonably prudent person exercising ordinary care under the circumstances. Whether the obstruction is an obvious hazard which a pedestrian should observe and avoid, or whether the obstruction is a hazard which a pedestrian exercising due care would not see unless posted with proper warning devices, depends upon all the surrounding circumstances. Factors to consider include the time of day, the nature of the pathway, distractions to the attention, familiarity with the obstruction, and the size, situation and color of the obstruction. Soileau v. South Central Bell Telephone Company, 406 So.2d 182 (La.1981); Artigue v. South Central Bell Telephone Company, 390 So.2d 211 (La.App. 3rd Cir.1980), writ denied 396 So.2d 917 (La.1981).
Dunaway testified that he was working in the area of building No. 1 on April 23,1979, when the opening in the wall was made by Hearn. On April 24, 1979, Dunaway went to work at 8:00 A.M. and again was in building No. 1. Each day at 10:00 A.M. and 2:00 P.M., the boilers in building No. 1 were "blown down" (steam was discharged) to get foreign matter out of the water and "keep chemicals down in your boiler." The hot steam was discharged in a steam pit on the outside of building No. 1. Dunaway testified that just prior to 10:00 A.M. on April 24,1979, he saw two workmen in the area of the steam pit and felt compelled to warn them that a boiler "blown down" was about to occur so *1068 they could leave the area to avoid injury. He walked at a fast pace (at one point in his testimony he said he was running) to the opening in the wall to warn the workmen. A Rester truck was partially obstructing the opening. Dunaway's path to the opening was around a boiler which partially blocked his view of the opening for an undetermined distance. Dunaway tripped on a rebar protruding ten to twelve inches from the floor and fell and injured himself. He did not see the rebar before he tripped on it, he did not know it was there before the accident, and he only saw it after the accident. Dunaway further testified that he knew that the wall had been removed.
Mitchell Magee testified that he, Grant Haley, and John Anderson were working for Rester on April 24, 1979, taking bricks off of the old boiler in building No. 1 and putting them in a Rester truck which was parked at the opening in the building. The rebars protruding from the floor were six to eight inches high and were bent over. The Rester truck was located in the doorway approximately ten to twelve feet from the steam pit. Magee caught Dunaway as he was falling, but Dunaway's elbow hit the side of the wall. Dunaway called to the men and either said that there was about to be a "blow down" or that coffee was ready. Magee testified that he could see the rebars in the doorway from twenty feet away on the inside of the boiler room.
John E. Anderson testified that he was working with Haley and Magee taking bricks from the old boiler and putting them in the truck. Magee was located six to eight feet from the steam pit when Dunaway fell. The rebars were protruding six to eight inches from the floor. Dunaway was walking toward the group and said coffee was ready when he fell.
The jury verdict shows that it accepted the version of the accident espoused by Dunaway, that Dunaway reasonably believed that the workmen outside the building were in danger, that he was not contributorily negligent and he did not assume the risk of injury. The finder of fact, be it judge or jury, should assess the credibility of witnesses to determine the most credible and realistic evidence. Guidry v. Davis, 382 So.2d 250 (La.App. 3rd Cir.1980). In reaching conclusions, the finder of fact need not accept all of the testimony of any witness as being true or false and may believe and accept a part or parts of a witness' testimony and refuse to accept any part or parts thereof. Ewing and Salter, Inc. v. Gafner Automotive & Machine Inc., 392 So.2d 762 (La.App. 3rd Cir.1980), writ denied 396 So.2d 933 (La.1981); LeBlanc v. Cordaro, 378 So.2d 1027 (La.App. 2nd Cir.1979); Payne v. New Orleans Public Service, Inc., 374 So.2d 189 (La.App. 4th Cir.1979). Although we might have reached a different conclusion than the jury, based on all of the facts and circumstances, we cannot say that the jury's verdict was clearly wrong. Arceneaux v. Domingue, supra.

IV. QUANTUM
The jury in the instant case rendered a lump sum award for damages of $650,000. The proper method for analyzing the propriety of a trial court award of damages is set forth in Reck v. Stevens, 373 So.2d 498, 501 (La.1979), as follows:
"Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
. . . .
"Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's `much discretion,' La.Civ.C. art. 1934(3) in the awards of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 *1069 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco [v. Winston Industries, Inc., 341 So.2d 332 (La. 1976)] for purposes of then determining what would be an appropriate award for the present case.
"In the initial determination of excessiveness or insufficiency, an examination of prior awards has a limited functionif indeed the facts and circumstances of the prior awards are closely similar to the present. The prior awards may serve as an aid in this determination only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) `similar' injuries, see Coco at 341 So.2d 334.
"However, absent an initial determination that the trial court's very great discretion in the award of general damages has been abused under the facts of this case, the reviewing court should not disturb the trier's award. Wilson v. Magee, 367 So.2d 314 (La.1979)."
(Footnote omitted).
Neither special verdicts nor interrogatories were used in the trial court to itemize the elements of damage. La.C.C.P. arts. 1811 and 1812. A lump sum judgment of damages is normally presumed to award all items of damage claimed, and the appellant's burden of proving that the fact finder clearly abused its much discretion is more difficult than usual because the intention to award a specific amount for any particular item is not readily ascertainable. Sorapuru v. Simon, 380 So.2d 1225 (La.App. 4th Cir. 1980). Each case must be determined on its own facts and circumstances, and we must examine each element of damage claimed to determine if there was an abuse of discretion. Washington v. Lake City Beverage, Inc., 352 So.2d 717 (La.App. 3rd Cir.1977), writ denied 354 So.2d 1050 (La.1978); Wade v. Mclnnis-Peterson Chevrolet, Inc., 307 So.2d 798 (La.App. 1st Cir.1975). In his petition, Dunaway sought recovery for the following elements of damages:
(1) medical expenses;
(2) lost wages;
(3) pain, suffering and mental anguish;
(4) disability; and
(5) disfigurement.
After reviewing the entirety of the record, we conclude, for the reasons set forth hereinbelow, that the jury award was grossly excessive. When a jury abuses its discretion in fixing damages, we are obligated to reduce (in this case fix) the award at the highest point which was reasonably within the jury's discretion. Cheatham v. City of New Orleans, 378 So.2d 369 (La. 1979).

A. GENERAL DAMAGES (Pain, Suffering, Mental Anguish and Disability, Past and Future)

Dr. Charles A. Strange was Dunaway's treating physician. Dr. Strange examined Dunaway on the day of the accident. He found swelling over the olecranon and some tenderness associated with limitations of motion of the left arm. There was tenderness over the radial head and Dunaway had some pain with gripping motions and dorsioflexion of the wrist which would irritate that area. The nerves and vascular supply were normal and the motion in the wrist and fingers was intact. X-rays revealed an olecranon fracture of the left arm, a cornoid injury, and a fracture of the radial head. (Dunaway is right-handed.) Because these injuries did not require immediate surgery, the arm was splinted with a posterior splint made of plaster of paris. Dr. Strange immobilized the arm hoping that Dunaway would heal on a nonsurgical course. Dunaway was also given pain medications. After the splint was removed, Dunaway received physical therapy.
During the course of this treatment, fluid developed in the elbow and it was aspirated with a needle. Subsequently, an incision was made in the elbow and the fluid was drained and the wound packed.
When these procedures proved unsuccessful, on June 5, 1979, the injured bursa was *1070 surgically removed and the bone at the top of the left elbow was roughened (excision of bursa and removal of spur). Dunaway was again placed on physical therapy. He lacked 15 degrees of flexion and extension in his left elbow, and the supination of his left arm was limited 30 degrees.
Between June and November of 1979, Dunaway developed degenerative arthritis in the injured area of his left arm. On November 1, 1979, a second surgical procedure was done to the elbow. The joint was opened and cartilage which lined the bone was removed and the bone was shaved. Dunaway was again placed in a splint. After the splint was removed, he was again placed in physical therapy.
By May of 1980, Dunaway reached the point of maximum recovery. He was referred to a Dr. Bannerman who recommended the use of a brace to support the arm when in use. Dunaway cannot climb, use wrenches, or other things requiring the use of both arms. The only treatment available to him since May of 1980 is symptomatic care, anti-inflammatory medicines and physical therapy (when needed). Dunaway testified that he did not have any strength left in his arm, that it hurts all the time, and "put a big deep blow" on his activities of fishing, hunting and playing golf. Dr. Strange testified that Dunaway had pain associated with his initial injury, "... pain around the time of the surgeries and I think occasionally now he has what we call discomfort as opposed to pain." Dunaway is disabled from doing heavy manual labor, but is not disabled from working in a supervisory or managerial capacity. At the time of trial, he had a life expectancy of 16.05 years.
Considering all of the above factors, we are of the opinion that the highest award which the jury could reasonably grant for general damages is $100,000. See, for example, Walton v. William Wolf Baking Company, Inc., 406 So.2d 168 (La.1981); Locicero v. State Farm Mutual Insurance Co., 399 So.2d 712 (La.App. 1st Cir.1981); Hebert v. Diamond M Company, 385 So.2d 410 (La.App. 1st Cir.1980), writ denied 390 So.2d 203 (La.1980).

B. IMPAIRMENT OF EARNING CAPACITY AND LOSS OF WAGES (Past and Future)
Dunaway was born on December 10,1924. He attended the U.S. Naval Academy for two years. From 1941 to 1961 he served in the U.S. Navy, sixteen years of which consisted primarily of sea duty, and he attained the rank of Chief Machinist. In 1953 he obtained a degree in Electrical Engineering from Monterey Engineering School in Monterey, California. At the time of the accident on April 24, 1979, he had been employed with the Hospital for nineteen and one-half years. On that date he was doing the work described in Section I of this opinion. On the date of trial (December 7 and 8,1981), he was fifty-seven years of age and had a work life expectancy of 8.8 years. On the date of the accident, Dunaway was earning $8.70 per hour plus a 25% bonus for duty at a leprosy colony. Dunaway testified that he earned $2,000 per month, that he earned $24,000 from his job in 1978, and earned $11,000 in 1979 until the date of the accident. Dunaway's income tax returns for previous years were not introduced into evidence. No economist or rehabilitation specialist was called to testify by either side.
Dunaway was totally disabled during the period from the date of the accident (April 24,1979) until May of 1980 when he reached maximum recovery, a period of thirteen months. He is entitled to recover lost wages of $26,000.
Dunaway's injuries permanently disqualified him from doing his previous employment and heavy manual labor. However, Dunaway is physically qualified to work in a managerial or supervisory capacity and is not totally disabled. Dr. Strange testified as follows:
"Q. You have studied the matter of his work, have you not?
"A. He has described the things. Basically, climbing, using wrenches, mechanic type of things that would involve use of both arms.

*1071 "Q. And it is your professional opinion that he is permanently disqualified from doing his previous employment?
"A. From the heaviest portions of them.
"Q. That's your opinion?
"A. Yes, as much as I understand it.
. . . . .
"Q. The only think (sic) that I would like to ask you is with respect to what he just asked you. Insofar as the duties of Mr. Dunaway involved supervision of other people which did not actually require any physical movement of his body at all, it was supervising other people. His injury to his elbow would not prevent him from doing that would it?
"A. I think in a managerial or supervisory capacity he could do that, yes."
Loss of earning capacity is compensable, just as loss of actual earnings. Folse v. Fakouri, 371 So.2d 1120 (La.1979).
The record does not reflect that Dunaway made reasonable efforts to minimize the loss of earnings as a result of his injuries after he reached maximum recovery in May of 1980. Dr. Strange testified regarding this as follows:
"Q. You suggested, I believe, that he go on and try to find out if he could physically go back to work and that he chose not to try to do that, is that what you told us in your deposition?
"A. As I said a while ago, many times along the course, you know, I suggested here we are at the end of the medical treatment. You are welcome to go try. There will be no other way to do it. It would be nice to graduate yourself back into it, if your employer allows it. That's basically what I said.
"Q. And as far as you know, he did not try to do that?
"A. No."
Dunaway testified that he has not worked since the accident and did not seek any work because he did not feel that he could do it.
In determining an injured person's net economic loss caused by impairment of earning capacity, one of the factors to be considered is the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity. Under either the Louisiana doctrine of mitigation of damages (Pisciotta v. Allstate Insurance Company, 385 So.2d 1176 [La.1979]), or the common law doctrine of avoidable consequences (Philippe v. Browning Arms Company, 395 So.2d 310 [La.1980]), an injured person has a duty to take reasonable steps to minimize his loss. (Compare the facts in Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La.App. 1st Cir.1982) and Philippe v. Browning Arms Company, supra, with the facts in the instant case.)
Other factors which may be considered in fixing awards of impairment of earning capacity are age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and the inflation factor. Unbehagen v. Bollinger Workover, Inc., supra. After considering all of the above facts, and considering the various factors for which there is evidence in the record, we are of the opinion that the highest award for loss of earning capacity which was reasonably within the jury's discretion, and is just and fair to both litigants and not unduly oppressive to either, is the sum of $150,000. See, for example, Walton v. William Wolf Baking Company, Inc., supra; Unbehagen v. Bollinger Workover, Inc., supra.

C. MEDICAL EXPENSES (Past and Future)

Dr. Strange testified that his charges to the date of trial were $2,105. There was no other evidence of medical bills *1072 and expenses presented and the plaintiff is entitled to recover that amount.[2]
The testimony of Dr. Strange indicated that Dunaway reached maximum recovery in May of 1980. Dr. Strange indicated that the only treatment needed thereafter was symptomatic care, anti-inflammatory medicines and physical therapy (when needed). Although Dunaway continues to see Dr. Strange on a routine basis, there was no evidence presented at the trial to show what his charges were, or what they would be in the future. Since there was no evidence presented on future medical expenses, Dunaway is not entitled to an award therefor.

D. DISFIGUREMENT
The evidence shows that Dunaway was involved in two surgical procedures to his elbow. However, no photographs of his arm were introduced into evidence and no physical description of his arm was presented. Accordingly, there is no evidence in the record upon which to base an award for disfigurement.

V. DIRECTED VERDICT FOR HEARN
Hearn contends that the trial court committed error by failing to grant its motion for a directed verdict at the close of Dunaway's case. The record reflects that Hearn did not elect to rest upon its motion for a directed verdict, but exercised its right to present evidence after the verdict was denied. La.C.C.P. art. 1810(A). In criminal cases in Louisiana, if a defendant introduces evidence after the denial of a motion for acquittal based on lack of sufficient evidence at the end of the state's case, his motion is deemed abandoned and the evidence in the case is judged on the entirety of the record. State v. Hicks, 376 So.2d 118 (La.1979); State v. Smith, 332 So.2d 773 (La.1976). We believe that this same rule should also be applicable in civil proceedings. Pugh, Louisiana Evidence Law, pages 1-14 (1974). Even if this rule were not applicable, there was sufficient evidence presented by Dunaway to justify the trial court's denial of the motion.

VI. IMPROPER JURY INSTRUCTIONS
Prior to the trial, Dunaway's counsel submitted for the court's consideration a proposed charge on the "rescuer" doctrine. Dodge v. Pierre, 348 So.2d 167 (La.App. 3rd Cir.1977), writ denied 351 So.2d 165 (La. 1977); Stevenson v. Delahaye, 310 So.2d 651 (La.App. 1st Cir.1975); Gambino v. Lubel, 190 So.2d 152 (La.App. 4th Cir.1966), writs denied 249 La. 834,191 So.2d 639 (1966), 249 La. 837, 191 So.2d 640 (1966) and 249 La. 843, 191 So.2d 642 (1966). Counsel for Hearn objected to this instruction and it was not given. However, the trial judge did instruct the jury on the doctrines of "sudden emergency" and "rescuer". Counsel for Hearn now complains in brief that these instructions were erroneous.
Our review of the record reflects that there was no objection entered to the jury charges actually given in the trial court. Since Hearn did not object to these charges, it cannot now assign as error the giving or the failure to give an instruction. La.C. C.P. art. 1793; Robillard v. P & R Racetracks, Inc., 405 So.2d 1203 (La.App. 1st Cir.1981); Ray v. Ameri-Care Hospital, 400 So.2d 1127 (La.App. 1st Cir.1981), writ denied 404 So.2d 277 (La.1981). CONTRA: Dixie Life Insurance Company v. Pacific Mutual Life Insurance Company, 416 So.2d 139 (La.App. 4th Cir.1982).

VII. CONCLUSION
For the foregoing reasons, the damage award rendered in the trial court is reduced to $278,105, with legal interest thereon from date of judicial demand until paid. La.C.C. art. 2924. In all other respects, the judgment of the trial court is affirmed. The appellant is to pay all costs.
AMENDED AND AFFIRMED.
NOTES
[1] The rebars anchor the concrete to the footing and to the wall. If the rebars are removed, substantial work is involved in replacing them.
[2] The evidence shows that on two occasions Dunaway had surgery at the Doctors Memorial Hospital in Baton Rouge, Louisiana. The hospital records were filed in evidence, but do not have statements of charges attached to them.