453 So.2d 964 (1984)
Michael FRITSCHER
v.
CHATEAU GOLF & COUNTRY CLUB.
No. 83-CA-799.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 1984.
Rehearing Denied August 17, 1984.
*966 Wiedemann & Fransen, A. Remy Fransen, Jr., New Orleans, for plaintiff-appellee.
Sessions, Fishman, Rosenson, Boisfontaine & Nathan, James Ryan III, Peter S. Title, New Orleans, for defendant-appellant.
Before CHEHARDY and GRISBAUM, JJ., and CLEVELAND J. MARCEL, Sr., J. Pro Tem.
GRISBAUM, Judge.
This is a personal injury action resulting from a jogging accident. The jury awarded $400,000 for general damages and $430,000 for special damages. From this judgment, the defendant appeals. We amend, and, as amended, we affirm.
Four major issues are presented:
(1) Whether the trial judge erred in refusing to charge the jury on the defense of assumption of risk?
(2) Whether the damage award is excessive?
(3) Whether the jury abused its discretion in finding plaintiff five percent negligent?
(4) Whether the trial judge erred in failing to reduce the amount of the award (by five percent) in accordance with the jury findings?
On January 28, 1981, Michael Fritscher fell into an open drain hole (while jogging at night) on the Chateau Golf & Country Club golf course which is adjacent to his home. He testified having no recollection of going home. His wife testified his face was bruised; he was dazed and incoherent. He complained to his wife of pain. Immediately following the accident he was unable to feed, dress, or bathe himself. She additionally testified he could not eat the next day and was nauseated for several days.
Dr. Courtney Leonard Russo, an orthopedic surgeon, examined him at his home immediately following the accident and then admitted him into the emergency room of a local hospital. The emergency room medical history indicated Fritscher's face being swollen around his right eye. It also noted his complaints of his neck being very stiff and his being slightly disoriented. The report indicated he had spasms in the paravertable muscles of the neck, slight numbness around the lips, and a brush burn on his right knee. X-rays were taken of the cervical spine and skull and of his knee. The x-rays were within normal limits. Fritscher was allowed to return home that same evening.
When Fritscher's condition did not improve, Dr. Russo recommended Fritscher see a neurosurgeon, Dr. J. Carlos Pisarello. Dr. Pisarello examined Fritscher on February 11, 1981. Fritscher at that time complained of pain in the neck and numbness of all fingersa tingling of all fingers all the way to the wrist. He complained of a constant headache and also of tingling in his feet. Dr. Pisarello's examination revealed a great deal of weakness and clumsiness in both hands. Fritscher had no command of any fine movement of the fingers. He had no significant abnormality of his legs but great stiffness of his neck. Any attempt at active or passive movement resulted in tightening, contractives of all the muscles in the neck.
Dr. Pisarello determined that the weakness of his hands was the result of a "central cord syndrome." Due to this condition, Dr. Pisarello decided to admit Fritscher into the hospital for treatment. Fritscher remained in the hospital for three weeks.
After a period of extended treatment, the plaintiff filed suit on December 3, 1981 against Chateau Golf & Country Club and U.S. Fire Insurance Company. After the trial on the merits, the jury found in favor of the plaintiff. Defendant U.S. Fire Insurance Company placed its policy limits in *967 the registry of the court. Chateau Golf & Country Club appeals the judgment.

JURY INSTRUCTIONSASSUMPTION OF RISK
The initial issue is whether the trial court erred in refusing to charge the jury on the defense of assumption of risk. The elements of the defense of assumption of the risk are: (1) that the plaintiff had knowledge of the danger; (2) that he understood and appreciated the risk therefrom; and (3) that he voluntarily exposed himself to such risk.
The record reflects Michael Fritscher was a member of the Chateau Golf & Country Club, and under its rules and regulations, permission was extended for jogging on the grounds. In November of 1979 that permission was limited to jogging only after dark.
During cross-examination, Fritscher admitted he knew of the drain hole and the fact that the drain cover was not on it. He testified he first noticed the hole without a cover in spring 1980. He stated he also saw it in the summer of 1980, at which time he complained to the Club that the hole had no cover. He explained he and one of his neighbors spoke to one of the Club's personnel. Either he or his neighbor told the Club that someone might kill himself if he stepped in the hole. Mrs. Fritscher also testified that Fritscher knew of the hole.
The record further reflects there was tall grass surrounding the "drain hole" during the time period preceding the accident; however, immediately preceding the accident, this grass was cut.
The following testimony given on direct examination by Fritscher is pertinent:
Q. Now, was there anything different about the hole on the night of the accident?
A. Well, it changed considerably.
Q. What happened?
A. Well, I had noticed it that night.
Iwhat I'm trying to say it was all manicured, cut....
Q. It's all right to tell me what you might do, but don't have to give the...
A. Well, you know, I don't neveryou know, the tall grass was a warning to me that there possibly could be a danger there and that morning it was gone, that night when I was jogging.
Q. All right.
A. You know, I hadn't recognized theI hadn't had the hole on my mind when I got completed from my exercise that night.
In light of the above facts, we find the trial judge erred in not giving an instruction on assumption of the risk to the jury since such an instruction would have properly reflected the law. The general rule is that where an omission of a requested charge precludes the jury from reaching a verdict in accordance with law and facts, this court of appeal should render a judgment on the record before it if this record is complete.
We are called to decide whether the trial judge's omission of the defendant's assumption of risk charge or charges was a mistake of law which foreclosed the jury's finding of fact on this issue. See Gonzales v. Xerox Corporation, 320 So.2d 163 (La. 1975); Louisiana Constitution of 1974, Article V, §§ 5 and 10. Clarifying this rule, Ragas v. Argonaut Southwest Insurance Company, 388 So.2d 707, 708 (La.1980) states:
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance *968 of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial.
We find we can fairly find a preponderance of the evidence from this record. We conclude after careful review of all the evidence that Fritscher did not assume the risk. As a member of the Country Club, Fritscher was given permission to jog on the grounds only at night. While generally aware of the hole, Fritscher normally identified the hole's location by the tall grass surrounding it. This grass constituted a natural barrier. The record reflects the tall grass surrounding the hole was cut prior to his run. The above-quoted testimony indicates Fritscher "may" have known that the tall grass had been cut prior to his run, but there is not sufficient evidence to indicate that he understood and appreciated the risk therefrom that evening and assumed the risk of that danger.
DAMAGES
Medical History
In reviewing this damage award, it is necessary to examine Fritscher's medical history since the accident. Active and very physical, Fritscher, prior to the accident, had begun a construction business in which he performed many of the jobs that are normally contracted out to various subcontractors. In addition to his work activities, Fritscher jogged, lifted weights, and did various daily exercises. Since the accident, Fritscher has been unable to work in his former capacity or perform his normal activities which included his exercise routine.
Immediately following the accident, Fritscher experienced constant pain. He described pain in his neck with any movement, a tingling of all his fingers to his wrist, weakness in his hands, tingling in his feet, and constant headaches.
Several weeks after the accident, Dr. Pisarello diagnosed Fritscher's condition as "central cord syndrome." Dr. Pisarello explained the condition as a bruising of the spinal cord caused by some acute bending beyond regular movement of the head. The spinal cord can become compressed or punctured. He continued to explain:
Some blood can get out of the blood vessels and enter into the tissue of the cord. And when this takes place, the area that's affected is the part of the cord that joins the neck to the thorax, to the chest. Literally the arms lose their relay station from the brain to the muscles and weakness of the arms, particularly the hands, takes place, whereas the legs are spared. This was the case with this gentleman when I saw him the first time around.
Due to his diagnosis of central cord syndrome, Dr. Pisarello admitted Fritscher into the hospital. While in the hospital for three weeks, Fritscher received physical therapy, a brain scan, a CAT scan, and an electroencephalogram. Fritscher's treatment also included use of drugs to reduce the swelling of the spinal cord and to return functions to his hands.
After his discharge, Dr. Pisarello saw Fritscher again on March 18, 1981 and at that time, he stated Fritscher was neurologically intact, but he still had a residue of muscle spasm in the neck. Thereafter, on May 6, 1981 when Dr. Pisarello saw him again, he had nausea and vertigo, which the doctor did not find unusual for a person who had had a concussion of the severity of Fritscher's. On the July 22 visit to Dr. Pisarello, Fritscher complained of headaches, frequent dizzy spells, and nausea; he also had a feeling of generalized weakness. Dr. Pisarello stated that neurologically Fritscher was normal, and the spasm of the neck was residing.
In October 1981, Dr. Pisarello found Fritscher still complained of headaches and some generalized feeling of numbness. Another CAT scan and electroencephalogram were repeated and both were normal. Dr. Pisarello warned Fritscher that any attempt to exert himself physically would cause an increase of pain in the muscles of the neck. Dr. Pisarello saw Fritscher a total of four times after his hospitalization *969 (March 18, May 6, July 22, and October 14, 1981).
Importantly, Dr. Pisarello opined that Fritscher may improve substantially, but he did not think Fritscher would return to normal at any time. He further did not think Fritscher was capable of any sustained physical activity; however, he did think Fritscher could return to his work as a contractor. He finally concluded that Fritscher's work activities would be limited to sedentary activities. He explained that the only things Fritscher could do occupationally or recreationally are activities in which exercise is mild to moderate and which can be interrupted frequently for rest.
Dr. Russo, Fritscher's treating physician and his orthopedic expert at trial, initially diagnosed Fritscher as suffering from a mild concussion, a cervical sprain and strain, and an abrasion of the right knee. He prescribed Tylenol, ice packs for the neck to be alternated with heat applications as the pain and spasms subsided, and a soft cervical collar.
Dr. Russo aided Dr. Pisarello in admitting Fritscher into the hospital because Fritscher's concussion was becoming more prominent, his headaches were more severe, and his neck pain and spasm were also more severe. While in the hospital, Fritscher received physical therapy, various types of heat applications and massage to the cervical and lumbar spine. He was also placed in immobilization with traction and a soft collar and was given sedation, muscle relaxants, and analgesics.
By mid-March 1981, according to Dr. Russo, Fritscher's grip had improved slightly, his neck showed a very slight improvement of the range and motion, and his neck flexion extension was very limited approximately 15 or 20 degrees. Dr. Russo explained that Fritscher would reach a point of improvement then experience muscle spasm. Fritscher's treatment remained the samephysical therapy, heat applications, muscle relaxants, and analgesics as necessary. Because his headaches continued, Dr. Russo prescribed Fiorinal Number 3 (a combined relaxant, pain pill and headache medicine), and a transcutaneous nerve stimulator.
Dr. Russo saw Fritscher every 10 to 14 days until June 1981; from June to September 1981, he saw him every three weeks. Over this seven-month period there was a very gradual improvement in his neck motion; however, his headaches continued. By June, Dr. Russo noted Fritscher became depressed and nauseated. Dr. Russo prescribed a mood elevator, Elavil. By September, his grip was almost normal, his upper extremities were fairly normal, and numbness in his finger was almost non-existent. Dr. Russo prescribed Periactin in September. During the entire seven-month period, Dr. Russo recommended Fritscher not participate at work or perform his exercises.
From September 1981 until February 1982, Fritscher visited Dr. Russo approximately every three weeks. Fritscher's condition improved but he still had some pain and spasm at the base of the neck, spasm in the paravertebral muscles and the trapezius muscles, and a neck extension of 15 to 20 degrees. His headaches were still prominent in the occipital region. He also reported weakness and shaking.
Dr. Russo summarized Fritscher's condition:
... I think thatof course we have to admit that there was a certain amount ofof degenerative changes in his neck to start with. The blow evidently was sustained to the head, secondarily to the neck, and he underwent a very serious whiplash injury; I believe he was out ofunconscious for maybe thirty to forty minutes, by history. With that amount of changes in the neck and with the amount of spasm and the neurological problems that hethat he had for this year and a half, I am fairly sure that the cervical cord was involved to a certain degree as well as the brain and the discs and nerves. The arthritis, I think, was probably aggravated and I think the cord itself took a blow for a while. Anytime the cord and the brain are involved, *970 it takes much longer for this type of tissue to heal than the muscles and ligaments and bones and regular muscular tissue....
I think thisI think the nerve tissue itself was damaged to a certain degree, meaning the brain and the spinal cord, to a certain degree, which made it much more extensive....
... So I think that with the amount of pre-existing degenerative change in there, things were tight to start with, and when he sustained this rather severe whiplash injury, acceleration, deceleration type injury, I believe that the cord itself was probably bruised as well as the nerves that come off the side, then of course the muscles and the ligaments, and of course the brain took a blow, too.
From September 1982 through April 1983 Fritscher continued to experience muscle spasm; however, he did improve. As of April 1983, the date of Dr. Russo's last examination of Fritscher, Dr. Russo opined that Fritscher could not return to being a "working" contractor nor would he be able to participate in vigorous activities as he had prior to the accident. However, on cross-examination, Dr. Russo admitted that Fritscher had no anatomical disability, but Dr. Russo felt Fritscher would be limited in his field as a "working" contractor.
In addition to Dr. Russo and Dr. Pisarello, on June 29, 1982, Dr. Richard W. Levy, defendant's expert in neurosurgery, examined Fritscher. Dr. Levy's examination revealed Fritscher had a slight limitation of movement of the neck in all directions and tenderness over the lower portion of the back of the neck. In other respects, the examination was entirely normal. Dr. Levy had X-rays taken which revealed slight arthritic changes affecting the fifth and sixth cervical vertebrae which he explained were in keeping for a man of 41 years of age. He further found no abnormality on the neck X-rays.
Dr. Levy's impression of Fritscher's condition was that Fritscher had sustained a mild concussion and a neck injury. He opined Fritscher did not have any residual abnormality from the concussion and further explained Fritscher had no sign of spinal cord injury in the neck nor did he have any sign of nerve root injury in the neck. He concluded Fritscher did not have a neurological disability as of June 1982, which was some 18 months after the injury. Levy also concluded that the two abnormalities which were found (a slight restriction of the neck movement and tenderness over the lower portion of the neck) were not the result of a spinal cord or nerve injury.
Regarding the question of disability, Dr. Levy testified, from a neurological point of view, Fritscher could return to his normal work. He further stated Fritscher could do anything he wanted to do and not suffer an injury to his spinal cord or his nerve roots that come from the spinal cord. Levy also opined that Fritscher had the least serious of neck injuries. He diagnosed Fritscher as having sustained a neck sprain. He explained patients with neck sprains generally recover. The period of recovery, according to Dr. Levy, extends from one year to two years or in some cases only months.
On cross-examination, he indicated the bony spurs which were apparent in the X-rays he ordered were not close to any nerve structure. He stated Fritscher's degenerative arthritic condition was minor for a man of 41 years.
During March 1981, Mr. Edwin Porche, a physiotherapist, began seeing Fritscher upon the recommendation of Dr. Russo. During the period between March 1981 through May 1983 Fritscher, under the advice of Dr. Russo, had 394 patient visits with Mr. Porche.
Initially, Mr. Porche found Fritscher had headaches, muscle tightness, blurred vision, and complaints of numbness in his right arm. Mr. Porche objectively noticed there was muscle tightness in the posterial cervical muscles and in the upper trapezius muscles and the mid-scapular muscles. He found Fritscher's range of motion was extremely limited in forward flexion; his right-hand grip was weakened significantly *971 and his right supraspinatus muscle had undergone atrophy (muscle wasting).
Initially, Mr. Porche prescribed at-home exercises for Fritscher, which he was to do after the first three weeks. Mr. Porche recalled the exercises aggravated Fritscher's pain; thus, Mr. Porche suggested discontinuing these exercises. In addition, Mr. Porche related Fritscher gradually improved but with every increase in activity, his symptoms would reappear. He also noted that whenever Fritscher was tense or apprehensive, his symptoms would return.
Characterizing his treatment of Fritscher, Mr. Porche stated Fritscher's whole treatment was an experience in "exacerbation." Mr. Porche reported Fritscher received temporary relief from his physical therapy. Mr. Porche's treatment includes moist heat, ultra-sound (deep heat), muscle massage, and transcutaneous electrical nerve stimulation.
Mr. Porche was asked whether Fritscher could return to his normal heavy exercise routineextensive jogging, repeated sit-ups, and workout with heavy weights for extended periods of time. Mr. Porche thought if he participates in normal exercise, Fritscher would have to continue physical therapy for another two years. Mr. Porche further answered he did not think Fritscher could do heavy exercise. Moreover, he thought in the future Fritscher would have trouble with anything that requires him to work his arms or lift his arms above his shoulder level; constant driving; looking up; twisting his neck; looking down; and prolonged writing. Mr. Porche expected Fritscher to be under his care for some time into the future. He testified Fritscher was, at the time of the trial, in a "chronic stage" characterized by exacerbation and remission of symptoms.
Mr. Porche finds Fritscher very mentally apprehensive; although observing that Fritscher is physically in "pretty good shape," Mr. Porche states Fritscher's pain in the neck area continues to date of the trial.
Pain and Suffering (Past and Future)
Louisiana Civil Code article 1934(3) provides that in assessing general damages, "much discretion must be left to the judge or jury ..." Only if the record "clearly reveals" that the trier of fact abused its discretion in making its award of damages, can we disturb an award of the trial court. Reck v. Stevens, 373 So.2d 498, 499-501 (La.1979). Only after an articulated analysis of the facts discloses an abuse of discretion, may an appellate court disturb the award as being (for articulated reasons) either excessive or insufficient. Reck, supra.
From the totality of the medical evidence, as well as the testimony of Fritscher, his wife, and his physical therapist, it appears the jury believed Fritscher is suffering from a severe neck injury. Both Dr. Russo and Dr. Pisarello opined that Fritscher had suffered an injury to his central spinal cord. Fritscher continues to report pain, and Dr. Pisarello, Dr. Russo, and Mr. Porche all indicate that activities only increase Fritscher's pain.
Considering the dramatic change in lifestyle Fritscher has experienced as well as his two years of suffering and projections that with increased activity his pain will increase, we cannot say (although we consider this award to be very generous), the jury abused its "much discretion" in awarding $400,000 for pain and suffering (past and future).
Loss of Income (Past and Future)
A framework for addressing the issue of whether the jury abused its discretion in awarding $400,000 for loss of income (past and future) is provided in Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064, 1071 (La.App. 1st Cir.1983). Dunaway states:
In determining an injured person's net economic loss caused by impairment of earning capacity, one of the factors to be considered is the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity. Under either *972 Louisiana doctrine of mitigation of damages [Pisciotta v. Allstate Insurance Company, 385 So.2d 1176 (La. 1979)] or the common law doctrine of avoidable consequences [Philippe v. Browning Arms Company, 395 So.2d 310 (La.1980)], an injured person has a duty to take reasonable steps to minimize his loss....
Other factors which may be considered in fixing awards of impairment of earning capacity are age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and the inflation factor.
To prove loss of income (past and future) plaintiff presented as an expert in accounting, Robert Laport, a certified public accountant. Mr. Laport had represented Fritscher since 1973. As his basis for calculating economic loss, Mr. Laport utilized a term called "economic benefit" (which he also called "economic value" or "actual income"). He derived the amounts for "economic benefit" for the year in question by calculating such things as capital gains, supervisory fees which were actually not recovered in the year that he reported, and property owned by Fritscher. What Mr. Laport termed "economic benefit" differed dramatically from Fritscher's adjusted gross income shown on his federal income tax returns. To best illustrate the differences in figures a chart is informative:

YEAR ADJUSTED GROSS INCOME ECONOMIC BENEFIT
1976 $16,306 $31,335
1977 $20,941 $23,786
1978 $16,824 $96,683
1979 $29,546 $323,000

Mr. Laport indicated that the average income for Fritscher for the years 1978-1980 was $100,000 per year. He also calculated for the years 1977-1979 the average economic benefit to be $105,000 per year.
On cross-examination Fritscher admitted his home in Folsom, which was included in the calculation of economic benefit for 1978, had in fact never been sold. His supervision fee of $12,000 which was also included in the $96,683 economic benefit value given for the year 1978 was reported in a latter year. The economic benefit in 1979 also included the value of Fritscher's home which he constructed himself; however, this home has not yet been sold.
Also a part of his calculations was lost profits from a planned construction project in Dillion, Colorado. Mr. Laport estimated the net profits from this proposed construction project in Dillion would be $198,000. There was much testimony in the record concerning this Dillion project which was initiated in January of 1981; however, according to Fritscher, due to his injury in early 1981, the project was aborted. To accomplish the Dillion construction project, Fritscher had flown to Dillion, Colorado, met with a real estate agent, and had a buy-sell agreement drawn up by the real estate agent. Fritscher planned to buy the Dillion property and construct on it. These would have been constructed as condominiums. Fritscher returned to New Orleans with the agreement; however, the agreement was never signed and financing was never procured for the project; nor did the seller ever sign any part of this agreement.
Mr. Curt Steiner was qualified as an expert in certified public accounting for the defendant. He had reviewed Fritscher's returns for the years 1972-1981. Based on a figure that he termed "average taxable income," he stated that Fritscher's average income for the years 1972-1980 was $6666. He also averaged income for the years 1977-1979, that figure was $7126. The average taxable income for the years 1977-1980 was $4726.
*973 Examining the economic proof for loss of income (past and present), we note Fritscher is a 42-year-old man who is a general contractor who, in addition to being an administrative contractor, also performed many subcontractor's services, such as painting, plumbing, placing sinks and counter tops, etc. as well as other facets in the construction of a residential home. Because he performed these services himself, he increased his gross income. In addition, he would build his own "temporary home," which he would later sell. Thus, through the capital gains tax structure, he generated additional net income.
The medical testimony, although conflicting in some respects, demonstrates that this contractor is able to perform at least sedentary work. At no point does the record indicate he could not work in the future for at least a minimum wage. More specifically, nowhere is it indicated he could not work as an administrative contractor (a position indicated by his employment history).
While Fritscher's adjusted gross income was presented, importantly, there was no testimony regarding Fritscher's degree of disability. We observe the record does not reflect, at any point, where evidence of Fritscher's life-work expectancy was introduced nor was any evidence produced as to what he could earn on a minimum wage basis over his life-work expectancy.
Moreover, we note lost profits resulting from an offense or quasi-offense must be proven with reasonable certainty. Damages will not be awarded where the lost profits are purely conjectural. See Koncinsky v. Smith, 390 So.2d 1377, 1383 (La.App. 3d Cir.1980). The Dillion project was in its very formative stages. A contract had not been agreed upon and no work had begun. While mathematical certainty is not required, sound judicial discretion must be exercised after all proper considerations are weighed. See Philippe v. Browning Arms Company, 395 So.2d 310 (La.1980). Since the purchase contract had not been completed and Fritscher had never engaged in construction in the State of Colorado, the evidence of loss of profits is speculative.
Since loss of profits has not been sufficiently proven and after considering all of the above facts and the various factors for which there is evidence in the record, we are of the opinion the highest award for loss of income which was reasonably within the jury's discretion, is the sum of $300,000. Therefore, the jury abused its discretion in its award of $400,000 for loss of income (past and future). We amend the award for loss of earnings from $400,000 to $300,000.
Medical Expenses
Defendant also questions as excessive the award of $30,000 for past and future medical expenses. The record indicates past medical expenses amounted to $18,204.50. A portion of that sum, $11,645.91, has been paid by defendant; therefore, $6558.59 is due for past medical expenses. The jury thus awarded $23,441.41 for future medical expenses.
Dr. Russo stated Fritscher would be under his future medical care for visitations which he calculated at $15 per visit. Dr. Russo did not know how many future visits would be required. The record reflects Mr. Porche stating he expected to continue treatments for Fritscher for an extended period of time. Moreover, the record reflects Mr. Porche's bill alone amounted to over $9000 over a two-year period.
Cushman v. Fireman's Fund Insurance Company, 401 So.2d 477, 481 (La. App. 2d Cir.1981), states:
A plaintiff has a right to recover for the cost of future medical treatment and these damages should not be denied because it is impossible to establish the nature and extent of the treatment that will be required and the exact cost of it.
We find the trial court did not abuse its discretion in awarding $30,000 for past and future medical expenses.
*974 DEGREE OF COMPARATIVE NEGLIGENCE
Defendant claims the jury erred in failing to find that Fritscher's damages were substantially caused by his own negligence amounting to at least 50 percent of his damages. (Instead, the jury found Fritscher only five percent negligent.) Defendant claims that Fritscher did not act as a reasonable man since he was aware of the open drain hole prior to the accident, lived only a few feet from the hole, and still jogged in its area.
Louisiana Civil Code article 2323 provides:
When a contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffer injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree of percentage of negligence attributable to the person suffering the injury, death or loss.
Before a jury's finding of fact can be overturned by this appellate court, we must find its factual conclusion "manifestly erroneous" or stated another way, "clearly wrong." Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). Considering all the facts of this case, especially that Fritscher, as a country club member, was allowed to run on the golf course only at night and that he was accustomed to the tall grass near the hole acting as a natural barrier, we cannot say the jury was clearly wrong in finding him only five percent negligent.
REDUCTION OF DAMAGE AWARD BY FIVE PERCENT
Addressing the final issue of whether the trial court erred in failing to reduce the amount of the award by five percent in accordance with the jury's findings, we note the record reflects a "misunderstanding" arose in relation to the jury interrogatories as to the question of negligence. The written interrogatories were marked yes to the question which related to comparative negligence. The question read whether "plaintiff was guilty of any negligence which was the proximate cause of his own injuries?" In the subsequent interrogatory, the jury found Chateau Golf's negligence caused 95 percent of the plaintiff's damages and injury, and plaintiff's own negligence caused five percent of his damages and injuries. However, when the foreman read verbally the jury interrogatories in open court, he misread the answer to the interrogatory regarding comparative negligence and stated the answer was no to the question of whether plaintiff was guilty of any negligence which was the proximate cause of his injuries. The foreman did, however, read the correct percentages of negligence. The plaintiff in his answer concedes to these facts and agrees that a reduction by five percent is required.
For the reasons assigned, the judgment of the trial court is amended from $830,000 to $693,500 and, as so amended, is affirmed. All costs of this appeal to be assessed equally between the appellant and the appellee.
AMENDED AND AFFIRMED.